INVESTMENT PROPERTIES OF ASHEVILLE, INC., AND BAXTER
H. TAYLOR v. MARTHA NORBURN MEAD ALLEN

No. 38

(Filed 9 May 1973)

1. **Principal and Agent § 5— contract made by agent — liability of principal**

    A principal is liable upon a contract duly made by his agent with a third person (1) when the agent acts within the scope of his actual authority; (2) when the contract, although unauthorized, has been ratified; (3) when the agent acts within the scope of his apparent authority, unless the third person has notice that the agent is exceeding his actual authority.

2. **Principal and Agent § 4— insufficiency of evidence of agency**

    The evidence was insufficient to show that defendant or anyone purporting to act for her promised to pay for grading work performed on her land under a contract with plaintiffs where it tended to show that defendant's brother had procured defendant's signature on a 50-year lease of her property to plaintiffs, plaintiffs informed defendant's brother that it would be necessary for defendant to execute a new lease subordinating her interest in the premises in order for them to finance construction of a motel on the site, defendant's brother refused to try to persuade defendant to subordinate her interest unless plaintiffs guaranteed to save her harmless if the construction loan was not paid, plaintiffs and defendant's brother engaged in extended negotiations concerning a new lease but plaintiffs were never willing to give a guarantee satisfactory to defendant's brother and no proposals were ever submitted to defendant, defendant's brother agreed that if plaintiffs would personally put up one-third of the cost of the motel he would "stand personally liable" for the cost of grading in the event defendant failed to sign a new lease of the property, plaintiffs forfeited their rights under the 50-year lease and defendant's brother thereafter negotiated a lease with a motel company which defendant signed.

3. **Principal and Agent § 5— contract on agent's credit — principal not liable**

    When a party contracts with a known agent personally on his own credit alone, he will not thereafter be allowed to charge the principal on the ground that the agent acted within the scope of his apparent authority.

4. **Principal and Agent § 6— unauthorized contract — ratification**

    The question of ratification of an unauthorized contract does not arise where the person making the contract did not purport to act as the agent of the person claimed to be the principal.

    Justices HUSKINS and MOORE dissent.

ON defendant's petition for a rehearing of her appeal from *Judge Harry C. Martin* at the 1 March 1972 Session of BUN-

COMBE and for a reconsideration of the decision reported in 281 N.C. 174, 188 S.E. 2d 441. The petition was allowed and the appeal docketed as Case No. 29 at the Fall Term 1972.

Plaintiffs seek to recover from defendant Allen the sum of $19,456.88 with interest from 1 October 1965. They allege that during negotiations for a long-term lease of defendant's "Acton property" they spent the principal sum in preparing it as a site for a proposed motel, and that defendant, by and through her agent, Dr. Charles S. Norburn, agreed that she would pay this cost. Defendant denied both allegations and plead a counterclaim, which is not involved in this rehearing.

Upon the trial the jury answered the issues in accordance with plaintiffs' contentions and the court entered judgment upon the verdict that plaintiffs recover of defendant the sum of $19,456.88, the actual cost of the grading done, with interest. From this judgment defendant appealed to the Court of Appeals, which held that plaintiffs had offered sufficient evidence for the jury to find that Dr. Norburn was acting as defendant's agent and that there was no error in the trial. Defendant appealed to this Court as a matter of right under G.S. 7A-30(2). By a four-to-three decision this Court affirmed the Court of Appeals. Defendant, in compliance with our Rule 44, petitioned for a rehearing. Under Section (3) of the Rule, she addressed her petition to a single Justice, who allowed it.

*Bennett, Kelly & Long and Hendon & Carson for plaintiff appellees.*

*Williams, Morris and Golding by James F. Blue III for defendant appellant.*

SHARP, Justice.

In the light of the petition to rehear, the Court has reconsidered the record and reviewed all briefs which have been filed. The question which we re-examine is the sufficiency of the evidence to withstand defendant Allen's motions, made in accordance with G.S. 1A-1, Rule 50, for a directed verdict and for judgment notwithstanding the verdict.

At the outset we note that at the same time plaintiffs filed this action against defendant Allen they also filed a separate suit against her alleged agent, Dr. Charles S. Norburn, to recover from him the cost of the grading which they had done on

Allen's Acton property. In that action plaintiffs alleged that on 17 June 1965 Norburn gave them his written agreement to "stand personally liable" for the actual cost of conduit grading and preparing the Acton property owned by Martha Mead Allen, "in case the lease is not continued after June 1, 1966," and promised "to pay in cash for this" or by the conveyance of "the 734-acre tract in Ashe County."

By consent of all the parties, Judge Martin consolidated the two cases for trial, and this case against Allen comes to us on the transcript of the consolidated trials.

In the Norburn case, the jury found that Dr. Norburn had received no consideration for his promise to pay the cost of grading Mrs. Allen's property in the event she refused to lease the lands to plaintiffs, and Judge Martin entered judgment that plaintiffs recover nothing of the defendant Norburn. Plaintiffs appealed as a matter of right, under G.S. 7A-30(2), and we ordered a new trial because of an error in the judge's charge. See *Investment Properties v. Norburn,* 281 N.C. 191, 188 S.E. 2d 342 (1972).

Upon the consolidation of the Allen and Norburn cases for trial, it was inevitable that plaintiffs would offer much evidence which was competent against Norburn but not against Allen. For instance, at the time the written agreement upon which plaintiffs sued Norburn was introduced in evidence as plaintiffs' Exhibit 10 (P-10), it was admitted only as against Norburn. When an "objection by Allen" was interposed to the admission of any evidence the ruling was either "sustained," "sustained as to Allen," or "overruled." Whatever the ruling, ordinarily the witness proceeded to answer the question, and the court gave no instruction limiting the jury's consideration of the testimony. However, we doubt whether the confusion inherent in this situation could have been avoided in any event. We now find that in our first consideration of this defendant's appeal we considered evidence which had been admitted only against defendant Norburn.

Our re-examination of the record discloses that plaintiffs' evidence applicable to defendant Allen tends to show:

Dr. Charles Norburn and Mrs. Allen are brother and sister. At the time of the trial he was 80 years old, and she admitted to being "older than Charles." In 1965 she owned their parents' old homeplace, sometimes referred to as the Acton

property; at others, as the Norburn property. Plaintiffs, Investment Properties, Inc., and Baxter H. Taylor, as co-venturers and partners, desired to acquire this property by a long-term lease as the site of a motel complex. Dr. Logan Robertson, then vice-president of Investment Properties, undertook the task of procuring the lease. He was related to the Norburn family by marriage; his son was married to Dr. Charles Norburn's daughter and his sister, to Dr. Norburn's brother. Several months prior to 10 May 1965, Dr. Robertson requested Dr. Norburn to persuade Mrs. Allen (Martha) to lease the Acton property to plaintiffs.

In a deposition introduced by plaintiffs, Dr. Norburn testified that in his negotiations with his sister he was representing Dr. Robertson "more than Martha," but he "wasn't going to see her cheated." Mrs. Allen, in her deposition introduced by plaintiffs, testified that Dr. Norburn was "certainly not acting as [her] agent" in connection with the lease of this property to plaintiffs; that she was renting the home and did not want to see the old homeplace destroyed and the hill removed. She wanted to keep the property as it was and continue to collect the rent. However, Dr. Norburn eventually convinced her that she should lease the property to plaintiffs.

On 10 May 1965 Mrs. Allen and Investment Properties, Inc., by its vice-president, Dr. Robertson, executed a contract whereby she leased "the old Norburn homeplace" to the plaintiff corporation for a period of fifty years from that date at a rental of $1,000.00 per month, the first payment to be due 10 May 1966, or sooner if lessee began to receive income from the property before that date. Lessor retained the right to re-enter whenever any installment of rent became ten days in arrears. Upon re-entry, should the value of improvements made upon the property be less than $60,000.00 lessee bound itself to pay lessor the difference between that amount and the value of improvements actually made. Lessee assumed complete responsibility for the property, including the payment of all taxes and assessments, and acquired "unrestricted control in grading, reshaping and development of this property."

Dr. Robertson testified that about a month after the execution of the lease of 10 May 1965 (plaintiffs' Exhibit 7), he "found out it was not a satisfactory loan instrument" and plaintiffs would not be able to finance the construction of the proposed motel complex, which the parties had contemplated

Investment Properties v. Allen

plaintiffs would build upon the property, because the lease contained no clause subordinating Mrs. Allen's rights in the land to those of the lending institution; that prior to May 1965 he had not discussed with Dr. Norburn the matter of a subordination clause because he knew Dr. Norburn did not want to subordinate; that Dr. Norburn had told him "he didn't want Martha to be in any jeopardy at all"; that upon learning subordination would be required for a construction loan, Dr. Robertson reported this situation to Dr. Norburn, and the two then conferred with an attorney about the matter; that Dr. Norburn wanted to convert the property to commercial use and "felt" that they could work out "a satisfactory lease."

Thereafter Dr. Norburn consulted several attorneys and, after ascertaining that a "subordination clause" would permit the lessees to finance the construction of the proposed motel by a first mortgage on the leased premises, he became "so afraid of the whole business" that he demanded a guarantee which would protect Mrs. Allen from any loss.

In defendant's deposition, which plaintiffs offered in evidence, Mrs. Allen testified that she told Dr. Norburn positively she would not execute a new lease "to these people" (plaintiffs) ; that she knew Dr. Norburn "wanted to do something with the property but [she] told him not to lease it to Logan [(Dr. Robertson)]." In July 1965 Mrs. Allen had an operation which was followed by a lengthy convalescence.

Dr. Norburn, in his deposition which plaintiffs introduced, testified that Dr. Robertson "came to [his] house day after day, with one proposition after another, trying to get [him] to get Martha to give [plaintiffs] another lease that would subordinate her property"; that plaintiffs proposed various "guarantees" for Mrs. Allen's protection and they had a number of "new leases" prepared; that Dr. Robertson "promised a guarantee of the return of the property at the end of the lease, free and clear of debt" and that is what he told Dr. Norburn to tell Martha; that the lease Dr. Robertson later tendered merely provided that her property would revert to her at the end of any month the rent was not paid; that at one time Dr. Robertson proposed that plaintiffs themselves would put up one-third of the cost of the motel, but thereafter he withdrew this proposition. Dr. Norburn never agreed that any of plaintiffs' proposals were adequate to protect Mrs. Allen and none

was ever shown to her. She knew nothing about any of them and at no time did Dr. Robertson or Mr. Taylor ever have any conversation with her about her property. She never executed any contract with plaintiffs except the lease of 10 May 1965.

On 5 June 1965, under a contract with plaintiffs, the Asheville Contracting Company (of which plaintiff Taylor was president) started grading defendant's property for the construction of the proposed motel. At that time Asheville Contracting Company also had a contract to do about three miles of grading and filling on Interstate Highway No. 40 near defendant's property. It was agreed between plaintiffs and Asheville Contracting Company that Asheville Contracting Company would use all surplus dirt from defendant's property on its I-40 project and that plaintiffs would not be charged for moving any surplus material so used. Before any grading began Dr. Robertson's son cleared the timber from the land and disposed of it as sawlogs and pulpwood.

Plaintiff Taylor testified that grading was begun on defendant's property on 5 June 1965 and continued for about two weeks. At that time, culverts and drainage pipes were put in and filling was done on the western part of the property. Except for some seeding this was the only work for which Dr. Norburn was billed, and all this was done before or during the week ending 12 June 1965. Thereafter Taylor's crew moved off temporarily but came back on two occasions to grade the back part of the property. On these two occasions they removed surplus material, that is, material not needed for fills on defendant's property, to fills on I-40. No charge was made for the removal of this surplus dirt. In all 25,000 cubic yards of dirt was moved, and about half of this dirt was used on defendant's property. The actual cost of moving this dirt, installing pipe, and seeding was $19,456.88, and Dr. Norburn was billed for this amount. Plaintiffs "had a guarantee for the work from a person [they] thought would pay." Dr. Robertson and Mr. Taylor had given Asheville Contracting Company their note for $19,456.88, but they have not received this amount from Dr. Norburn or anyone else.

At the time plaintiffs were grading her property, Mrs. Allen was quite sick, and Dr. Norburn did not keep her informed about his negotiations on the grading. At some undisclosed time he took her to the property and showed her what had been done.

Dr. Robertson testified that after July 1965 he regarded the lease to be null and void; that on 12 December 1966, at Dr. Norburn's request, he made the following entry upon it and returned it to Dr. Norburn: "Lease forfeited and returned this date. Settlement in accordance with the provisions of the lease and its associated papers is to follow. Investment Properties of Asheville, Inc., by Logan T. Robertson, Vice-President"; that notwithstanding this entry he did not regard the motel project as abandoned; that he continued to think they were still attempting to work out a "mutually agreeable lease" until he heard that defendant had signed a lease with West Side Motel Company on 13 October 1967.

The only communication which Mrs. Allen herself ever received from either of the plaintiffs with reference to a lease was a letter written by Dr. Robertson to her on 29 September 1965. Therein he told her that Dr. Norburn had told him she was worried about plaintiffs' request for a change in the lease and that this had bothered him too; that when he had proposed the lessees put up one-third of the cost of constructing the motel he had not cleared this with his associate; that their money was "well invested" and "it would entail considerable loss to carry out [that proposal]." Dr. Robertson enclosed a "new lease" which he thought to be "a fine offer" for her property and "a far safer guarantee." He also promised to grade the entire area of the property. Mrs. Allen did not answer this letter, and she never signed the new lease which was enclosed.

In her deposition, which plaintiffs introduced in evidence, Mrs. Allen testified that after plaintiffs forfeited the lease of 10 May 1965 she knew then that "something would have to be done with the property" and, following her brother's advice, she later executed a lease to the West Side Motel Company for the purpose of building and operating a Holiday Inn on it. Plaintiffs offered this lease, dated 13 October 1967, in evidence, but the court admitted only one sentence in it: "Lessee acknowledges that certain grading, excavating, and laying pipes and building manholes have heretofore been done on the leased premises."

At the close of plaintiffs' evidence defendant's motion for a directed verdict that plaintiffs were entitled to recover nothing from her was denied.

The unrestricted testimony of Dr. Norburn as a witness for the defense in the consolidated trials tended to show:

Prior to 17 June 1965 he had told Dr. Robertson "that Martha had flatly refused to mortgage her place." On the night of 17 June 1965 Dr. Robertson came to his home with the proposition that if Mrs. Allen would "mortgage her place" for one-third of the cost of a 150-room motel, costing about one and a quarter million dollars, he and Mr. Taylor and their two associates (Britt and McCullagh) would put up one-third of the money. This proposition seemed reasonable to Dr. Norburn and he told Dr. Robertson he believed his sister "would sign that," but she would not do it "right off the bat"; that it would take a little time, but if he kept talking to her he thought he could get her to sign it. Dr. Robertson's reply to this was, "There isn't any time, if she doesn't sign it now we are going to take the machines away and we don't know when we will do anything more and the Holiday Inn people instead of building there will build at Hendersonville, North Carolina, and they won't want this place." Upon hearing this Dr. Norburn said, "Well, go ahead and do it, I feel certain she will sign it." Dr. Robertson said, "Suppose she doesn't?" Dr. Norburn's answer was, "Well, I know she will and if you will put up that much money [(one third)] and grade that property for a motel site I will guarantee that she will sign it. If she does not I will pay for it myself." Dr. Robertson responded to this offer by saying, "Put it in writing." Dr. Norburn immediately wrote and signed the document introduced in evidence against him as P-10. (On defendant's cross-examination, Dr. Robertson, when he testified as a witness for plaintiffs, denied that he had secured Dr. Norburn's promise to pay (P-10) in the manner detailed by Dr. Norburn. Dr. Robertson's version of the transaction was not admitted as against Allen.)

Prior to 17 June 1965 there had been no discussion between Dr. Norburn and either of the plaintiffs about taking dirt from defendant's property over to the I-40 fill and neither Dr. Norburn nor Mrs. Allen knew of this plan.

After Dr. Norburn agreed to pay the cost of grading if the lease of 10 May 1965 was not continued after 1 June 1966, plaintiffs declined to put up one-third of the cost of constructing the motel, and they never presented a proposed lease incorporating such a provision. They continued, however, to grade defendant's lot and began to remove dirt from the property to the

I-40 fill. Sometime during September, after observing that defendant's property had been striped of its soil, Dr. Norburn went to his sister's attorney, Mr. James Howell, who caused "Taylor's men" to stop taking the earth. When Mrs. Allen saw that her place "was in ruins" she blamed Dr. Norburn for it, and he then "tried to get something out there that would be profitable for her."

On 12 December 1966, Dr. Norburn told Dr. Robertson that Mrs. Allen was demanding that plaintiffs surrender the lease of 10 May 1965 and pay her the amounts due under it. When Dr. Robertson said that plaintiff's didn't have the money Dr. Norburn said, "Well, give the lease up and let her rent it to somebody else." It was then that Dr. Robertson made the entry of forfeiture upon the lease as previously quoted herein and returned the lease to Dr. Norburn.

Dr. Norburn testified that, as he saw it, when plaintiffs failed to fulfill Dr. Robertson's promise that they would personally put up one-third of the cost of the motel they breached the promise which caused him to guarantee the cost of grading and thereby released him from the agreement.

Dr. Norburn began negotiations for a lease of defendant's property to the West Side Motel Company for the construction of a Holiday Inn after Dr. Robertson surrendered the lease of 10 May 1965 to him. When this lease was prepared Dr. Norburn gave it to his brother, Dr. Russell Norburn, who was acting for Mrs. Allen. Dr. Russell Norburn took the lease to her and, after she went over it with him and her lawyer, she signed it.

Plaintiffs seek to hold Mrs. Allen liable for the cost of the grading they engaged Asheville Contracting Company to do upon the theory that Dr. Norburn, acting within the scope of his authority as her agent, authorized the work and agreed to pay for it. 3 Am. Jur. 2d *Agency* § 261 (1962). Defendant's motion for a directed verdict presents the question whether the evidence, viewed in the light most favorable to plaintiffs, is legally sufficient to establish this premise. *Adler v. Insurance Co.*, 280 N.C. 146, 185 S.E. 2d 144 (1971); *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971).

[1] A principal is liable upon a contract duly made by his agent with a third person (1) when the agent acts within the scope of his actual authority; (2) when the contract, although

unauthorized, has been ratified; (3) when the agent acts within the scope of his apparent authority, unless the third person has notice that the agent is exceeding his actual authority. *Research Corporation v. Hardware Co.*, 263 N.C. 718, 721, 140 S.E. 2d 416, 418-19 (1965) ; *Hooper v. Trust Co.*, 190 N.C. 423, 130 S.E. 49 (1925). "One dealing with an agent or representative with known limited authority can acquire no rights against the principal when the agent or representative acts beyond his authority or exceeds the apparent scope thereof." *Texas Co. v. Stone*, 232 N.C. 489, 491, 61 S.E. 2d 348, 349 (1950).

[2]    When plaintiffs rested their case against Mrs. Allen the evidence tended to show: At plaintiffs' request on 10 May 1965 Dr. Norburn had procured Mrs. Allen's signature to a contract in which she leased her Acton property to Investment Properties, Inc., for a term of 50 years at a specified monthly rental to begin not later than 10 May 1966, or earlier if plaintiffs began to receive any income from the property. The contract gave plaintiffs carte blanche in grading, reshaping, and developing the property, but it contained no agreement that defendant would subject her land to the lien of a construction loan if plaintiffs required borrowed money to develop the premises. Dr. Norburn had previously made it quite clear to Dr. Robertson, who was acting for plaintiffs, that he was not interested in subordinating his sister's interest in the land, and plaintiffs had accepted the lease with that understanding. Shortly thereafter, however, Dr. Robertson told Dr. Norburn that plaintiffs would not be able to finance construction of the motel complex they had planned to put on the property unless they could give the lender a first lien on the premises.

After consulting counsel and learning the possible consequences of such a concession Dr. Norburn told Dr. Robertson that he would not try to persuade his sister to subordinate her interest in the leased premises unless plaintiffs gave her a guarantee which would save her harmless in the event the construction loan was not paid. Subsequently Dr. Robertson came to Dr. Norburn's home "day after day with one proposition after another, trying to get [him] to get Martha to give [Dr. Robertson] another lease that would subordinate her property." When informed of the situation Mrs. Allen told Dr. Norburn flatly that she would not execute a new lease to "these people," and told him pointedly not to lease the premises to Dr. Robertson.

Notwithstanding defendant's instructions, Dr. Norburn continued to regard the proposed construction of a motel on her premises as a good business proposition for his sister *if* she could be secured against loss, and he continued to negotiate with Dr. Robertson for a guarantee which would protect her in the belief that they could agree upon one. However, plaintiffs were never willing to give a guarantee satisfactory to Dr. Norburn, and he never approved any proposition which they presented to him. Neither he nor they ever submitted any of these proposals to Mrs. Allen. She never agreed to subordinate her property, and she never signed another contract of any kind with plaintiffs.

The fact that Dr. Norburn, at plaintiffs' instance had obtained his sister's signature to the lease dated 10 May 1965 did not clothe him with apparent authority to re-negotiate the lease, and all the evidence tends to show he had no actual authority to do so. Further, the evidence tends to show that throughout their negotiations with Dr. Norburn plaintiffs were fully aware (1) that they could not secure a construction loan for their motel project unless Mrs. Allen executed a new contract in which she agreed to give the lending institution a first lien on the leased premises; (2) that without a new contract they expended funds and graded her property at their own risk; (3) that until they could agree with Dr. Norburn upon a guarantee which he believed would protect Mrs. Allen he would not attempt to get her signature on a new lease; and (4) that even if they satisfied Dr. Norburn, he might not be able to procure her signature. Notwithstanding, plaintiffs continued to go forward with preparations to construct the motel. They cleared defendant's property of all growth and did extensive grading on it as a site for a motel. The portion of this work for which plaintiffs seek to recover from defendant was completed by 12 June 1965 except for seeding.

The only explanation of plaintiffs' course of conduct is the testimony of plaintiff Taylor that, "we had a guarantee for the work from a person we thought would pay." This person was certainly not Mrs. Allen. She never agreed to pay plaintiffs anything and the record contains no suggestion that she knew anyone else had done so.

Plaintiff Taylor testified that "they" charged the work done on Mrs. Allen's property to Dr. Norburn and, sometime

later, he billed him for the $19,456.88—the bill for which they have sued both Dr. Norburn and Mrs. Allen.

It is in evidence from Dr. Norburn's unrestricted testimony as a witness for the defense that, on 17 June 1965, when Dr. Robertson threatened to abandon the motel project unless plaintiffs got a new lease, Dr. Norburn told him if plaintiffs would put up one-third of the cost of the construction he felt certain his sister would execute a new contract; that, if she did not, he would pay for the grading done in the meantime. It was then that Dr. Norburn wrote out and signed plaintiffs' Exhibit 10, which is not in evidence against Allen.

[3] Without Dr. Norburn's testimony there is no evidence in the Allen case from which the jury could find that either she or he ever promised to pay for the grading. This testimony, however, does not help plaintiffs' case for it shows (1) that Dr. Norburn made the promise upon a condition which was not met and (2) that he made the agreement with plaintiffs in his personal capacity and not as the agent of Allen. In making his promise of 17 June 1965 to Dr. Robertson, Dr. Norburn did not profess to be acting for Mrs. Allen. He acted in his own name and pledged his credit only. Dr. Robertson understood this and was then satisfied to have it so. Plaintiffs did no grading on Mrs. Allen's property in reliance upon any obligations on her part to pay for it. *See Rounsaville v. Insurance Co.,* 138 N.C. 191, 50 S.E. 619 (1905). When a party contracts with a known agent personally on his own credit alone, he will not be allowed afterwards to charge the principal. Having dealt with the agent as a principal he cannot set up an agent's apparent authority, on which he did not rely, so as to establish rights against a principal. 3 Am. Jur. 2d *Agency* §§ 75, 271 (1962). *See also* Mechem, *Outlines of the Law of Agency* § 297 (4th ed. 1952).

[4] We now hold, therefore, that the evidence admitted against Mrs. Allen is insufficient to establish that she or anyone purporting to act for her promised to pay for the work done on her property by Asheville Contracting Company. That being so, no question of ratification arises since "ratification is not possible unless the person making the contract, in doing so, purported to act as the agent of the person . . . claimed to be the principal. *Air Conditioning Co. v. Douglass,* 241 N.C. 170, 84 S.E. 2d 828; *Flowe v. Hartwick,* 167 N.C. 448, 83 S.E. 841." *Patterson*

*v. Lynch, Inc.,* 266 N.C. 489, 492-93, 146 S.E. 2d 390, 393 (1966). *See also Annot.,* 124 A.L.R. 893 (1940).

Upon reconsideration on rehearing, the Court now determines: (1) Its former decision reported in this case, in 281 N.C. 174, 188 S.E. 2d 441, affirming the decision of the Court of Appeals (13 N.C. App. 406, 185 S.E. 2d 711), was not sustained by the record and is no longer authoritative. (2) The trial court erred in overruling defendant's motion for a directed verdict and for judgment notwithstanding the verdict. (3) The order affirming the Court of Appeals is vacated. (4) This opinion becomes the law of the case.

The decision of the Court of Appeals is reversed with directions that it remand the case to the Superior Court of Buncombe County for the entry of judgment dismissing the action with prejudice.

Reversed.

Justices HUSKINS and MOORE dissent.