IN THE MATTER OF THE APPLICATION OF CAMPSITES
UNLIMITED INC.

No. 50

(Filed 6 June 1975)

1. **Municipal Corporations § 31— zoning — review of decision by board of adjustments**

    When a proceeding is before the superior court upon certiorari for review of the order of a county board of adjustments, the findings of fact made by the board, if supported by evidence introduced at the hearing before the board, are conclusive.

2. **Municipal Corporations § 31— zoning — review of decision of board of adjustments**

    Upon review by certiorari in the superior court of an order of a county board of adjustments, the matter is before the court to determine whether an error of law has been committed and to give relief from an order of the board which is found to be arbitrary, oppressive or attended with manifest abuse of authority; it is not the function of the reviewing court to find the facts but to determine whether the findings of fact made by the board are supported by the evidence before the board.

3. **Municipal Corporations § 30— zoning — nonconforming use — building or other development — expenditure of money or contractual obligation**

    In order for a landowner to acquire a vested right to continue development of land as a nonconforming use after the enactment of a

zoning ordinance, it is not material whether the proposed development and use of the land be the construction of a building or some other development, such as construction of recreational facilities, roads, water and sewer lines and the grading, clearing and development of the sites for the proposed use of the property; furthermore, there is no basis for distinction between the actual expenditure of money and the incurring of binding contractual obligations for such expenditure, or between expenditures for the acquisition of the land, for the acquisition of building materials or services and for the making of visible, physical changes in the condition of the land.

4. **Counties § 5; Municipal Corporations § 30— zoning ordinance — good faith expenditures before passage — knowledge zoning under consideration**

The developer of a lakeside campsite project did not act in bad faith in making and incurring substantial expenditures and obligations in the development of the project prior to the adoption of a county zoning ordinance which would prohibit the use of the land for such purpose where the evidence in the record shows that at the time the developer acquired and began work on the property it knew no more concerning the county's plans for zoning than that a general consideration of zoning of the entire rural portion of the county was in progress by the Planning Board, that the Planning Board, itself, had not determined what zoning restrictions it would recommend to the county for the area including the land in question, and that the reason the developer proceeded speedily with its development was not to win a race with the proponents of zoning but to get its property in condition to take advantage of the spring and summer market for the sale of campsites; therefore, the developer has a right to continue development of its property as a nonconforming use to which the zoning ordinance does not apply.

5. **Counties § 5; Municipal Corporations § 30— zoning ordinance — good faith expenditures — attempt to "beat" ordinance**

Statement by a developer's president at a public hearing several months after development of land had begun that he was aware that zoning "had been in the planning stage for a year or so" and that he was "trying to beat it" does not show bad faith by the developer in proceeding with its proposed development.

6. **Counties § 5; Municipal Corporations § 30— study of zoning — right of landowner to develop property**

The right of landowners to develop their properties in ways then lawful cannot be frozen by a county's or a municipality's announcement of its undertaking of a general study of zoning which, at some future date, may or may not lead to the adoption of an ordinance restricting the landowner's proposed use of his land.

7. **Counties § 5; Municipal Corporations § 30— zoning ordinance — nonconforming use — entire campsite project**

Although roads had been cut in only five of eight sections of a campsite development project and lots had been staked off in only one area at the time a county zoning ordinance was passed, the entire development constituted a nonconforming use where the evi-

dence shows that the detailed map of the project was prepared in eight sections solely in order to permit the use of a scale sufficient to make the map readable, not because of any plan to develop the tract in sections, and that, from the outset, the developer intended to develop the entire property as promptly as possible without interruption and without regard for section boundaries.

APPEAL by Stanly County from the North Carolina Court of Appeals which reversed the judgment entered by *Seay, J.,* at the 4 February 1974 Session of STANLY, approving and confirming the order of the Board of Adjustments for Stanly County, *Vaughn, J.,* dissenting. The decision of the Court of Appeals is reported in 23 N.C. App. 250, 208 S.E. 2d 717.

Campsites Unlimited Inc., hereinafter called Campsites, is the owner of a 155-acre tract of land which borders on Lake Tillery in Stanly County. It purchased this tract for the purpose of developing it as recreational property and subdividing it into lots for sale as camp sites, the average size of the lots to be 40 feet by 80 feet. From the beginning its development plan has contemplated the construction of a system of private roads, a swimming pool, a marina, a restaurant, a pavilion and a central sewage disposal system, and the sale of the lots to individuals for the use thereon of camper vehicles, no buildings to be permitted on such lots. At the time Campsites acquired the property, Stanly County had no zoning ordinance applicable to its rural areas.

In July 1971, Stanly County established a planning board, which immediately took under consideration plans for zoning the county's rural areas. A preliminary zoning plan was presented to the county officials in June 1972. The Board of Commissioners took the proposal under consideration and tentatively set 1 July 1973 as the date by which it hoped to put a zoning ordinance into effect.

Campsites acquired its land by deed dated 25 January 1973. Its president, organizer and, apparently, its sole stockholder, is C. L. Darnley. According to his testimony, he conceived the idea of a camp site development in the Lake Tillery area in the latter part of 1971 or early in 1972, procured an option on the land, retained counsel and employed an engineer to make the necessary surveys, lay out streets and prepare maps. The purchase price of the property was $156,000, of which $5,000 was paid in cash at the time the deed was delivered. Rights for the construction of the contemplated restaurant and marina upon the

property were sold to another party in February 1973. At about the same time, an oral agreement was reached with Carolina Power and Light Company for a lease to be executed permitting certain uses of its lake front property by occupants of the proposed development and the drafting of engineering plans for sewer and water services was begun.

Mr. Darnley's plan was to develop the entire 155 acres as rapidly as possible, using the proceeds of early lot sales for the financing of the remainder of the total development. He pressed its engineers to move rapidly in order to open the development by early spring, 1973, in order to take advantage of the seasonal market for sale of lots for camp site purposes. A wet spring delayed the clearing, grading and construction of the streets. Workers cutting and clearing trees closely followed engineers staking streets and were, in turn, followed immediately by other workers grading the streets. The actual grading of the streets began about 10 March 1973. On or about 28 March 1973, Mr. Darnley first learned that some neighboring landowners objected to his proposed development and that, as a result, the county might adopt zoning regulations for the area. The work on the project continued.

On 16 April 1973, the County Board of Commissioners adopted a zoning ordinance, effective immediately, whereby the area which includes the property of Campsites was designated "R-20." The ordinance provides that land in an "R-20" district may not be used for camp site development and the minimum size of a lot is 20,000 square feet. The average size of the lots, according to Campsites' plan, is 3,200 square feet.

The total cost of the entire contemplated development would be not less than $2,700,000. At the time the zoning ordinance was passed, Campsites had paid out, or become obligated to pay, approximately $275,000 for the purchase of the land, engineering and surveying fees, road construction, and other expenses. Its engineers had prepared a perimeter map of the entire development area and detail maps of the entire 155 acres, in eight sections, showing streets and lot boundaries, a total of 1,200 camp site lots being so shown. The roads so laid out were not designed for and would not be suitable for single-family residential lots 20,000 square feet in area. They were designed for slow speed traffic in a camp site development. They were not intended to become part of the public road system. The maps showing streets and lot boundaries were prepared in sections

in order to permit use of a scale sufficiently large to make the map usable, not because of any plan to develop the tract in sections. At all times the plan of Campsites was to proceed with the entire development as promptly as possible.

At the time the zoning ordinance was adopted, roads had been actually cut in the areas shown on map sections #1 through #5 and lots had been staked off in the area shown on map section #1. Nothing had been done in the actual development of the areas shown on map sections #6, 7 and 8.

Campsites applied to the County Board of Adjustments for recognition of its development as a preexisting, nonconforming use. Following a hearing, the Board issued its order denying permission to continue the development as a nonconforming use. It found:

"Applicant has failed to sustain its claim that the expenditures of money made by it and for which it became obligated to make [sic] on its 155-acre tract were made in good faith without knowledge that the Board of Commissioners of Stanly County was contemplating adopting a Zoning Ordinance encompassing the area in which the 155-acre tract lies, and prohibiting the use of its property in the manner and for the purposes proposed by Applicant."

This finding by the Board was predicated upon its findings that with knowledge that "zoning was in progress" with a target effective date of 1 July 1973, Mr. Darnley told his engineer on 12 January 1973 that he "wanted to expedite things as fast as possible" and wanted to open (i.e., begin selling lots) by early spring, and that at the hearing on 16 April 1973, following which the zoning ordinance was adopted, Mr. Darnley stated that he was aware that zoning had been in the planning stage for approximately a year and "he was trying to beat it."

Upon review in the Superior Court upon certiorari, the court considered the evidence presented at the hearing before the Board of Adjustments, and entered its order making findings of fact substantially identical to those found by the Board of Adjustments and approving and confirming the order of that Board.

On appeal to the Court of Appeals, that court reversed and remanded the matter to the Superior Court "with the direction that the court enter judgment in this matter declaring the

entire development in question to be a nonconforming use and further declaring the property free of the effect of the zoning ordinance of 16 April 1973."

*Brown, Brown & Brown by Richard L. Brown, Jr., for Stanly County.*

*Henry C. Doby, Jr., for James A. Henson et al.*

*Russell J. Hollers and John V. Hunter III for Campsites Unlimited, Inc.*

LAKE, Justice.

**[1, 2]** This proceeding came before the Superior Court upon certiorari for review of the order of the Board of Adjustments for Stanly County. Upon such review, the findings of fact made by the Board, if supported by evidence introduced at the hearing before the Board, are conclusive. *In re Application of Hasting,* 252 N.C. 327, 113 S.E. 2d 433; *In re Pine Hill Cemeteries, Inc.,* 219 N.C. 735, 15 S.E. 2d 1. The matter is before the Court to determine whether an error of law has been committed and to give relief from an order of the Board which is found to be arbitrary, oppressive or attended with manifest abuse of authority. *Durham County v. Addison,* 262 N.C. 280, 136 S.E. 2d 600; *Lee v. Board of Adjustment,* 226 N.C. 107, 37 S.E. 2d 128. It is not the function of the reviewing court, in such a proceeding, to find the facts but to determine whether the findings of fact made by the Board are supported by the evidence before the Board. It may vacate an order based upon a finding of fact not supported by evidence.

In the present case, the Superior Court set forth in its judgment what purport to be findings of fact by it. The material portions of these are identical with the material findings of fact made by the Board of Adjustments. For the purposes of this appeal we treat these portions of the judgment of the Superior Court as merely the determination by the Superior Court that the findings of fact made by the Board of Adjustments are supported by the evidence contained in the record of the hearing before the Board. Such a determination by the Superior Court is its conclusion upon a question of law and is reviewable, as such, by the appellate courts.

The statement of facts above set forth is a summary of uncontradicted evidence set forth in the record of the hearing

before the Board of Adjustments. The key finding of fact by the Board was:

> "8. Applicant has failed to sustain its claim that the expenditures of money made by it and for which it became obligated to make on its 155-acre tract were made in good faith without knowledge that the Board of Commissioners of Stanly County was contemplating adopting a Zoning Ordinance encompassing the area in which the 155-acre tract lies, and prohibiting the use of its property in the manner and for the purposes proposed by Applicant. This finding of fact is based on the following evidence:"

We summarize the Board's statement of the basis for its said finding of fact as follows:

> Mr. Darnley testified that in the fall of 1972 he had knowledge of the proposed zoning in Stanly County, but believed that his project would be almost finished prior to 1 July 1973, the tentative target date for the adoption of some zoning ordinance by the Board of County Commissioners. He had been advised by the real estate agent, through whom he purchased the land in question, that "they were in the process of trying to get zoning in Stanly County."

> Mr. Darnley made no inquiry of the Planning Administrator and Zoning Administrator prior to the adoption of the zoning ordinance on 16 April 1973. He made no personal inquiry of anyone between November 1972 and the passage of the ordinance on 16 April 1973 as to whether there was any zoning in effect or in contemplation in Stanly County. The Stanly News and Press, a newspaper published in Albemarle, carried various news stories relative to zoning in the county, which stories began as early as October 1971. Mr. Darnley read this newspaper "on occasions" and read a story in the paper about the appointment of the County Planning Board (July 1971). With knowledge that zoning was "in progress in Stanly County with a target effective date of July 1, 1973," Mr. Darnley told his engineer on 12 January 1973 that he "wanted to expedite things as fast as possible" and "wanted to open by the first of March, if possible, or by early spring." At the hearing on 16 April 1973, following which the zoning ordinance was adopted by the Board of County Commissioners, Mr. Darn-

In re Campsites Unlimited

ley, in response to a question by "someone," stated that he was aware that zoning "had been in the planning stage for a year or so" and that he "was trying to beat it."

It is indisputable that prior to 16 April 1973 there was no zoning ordinance or other law in effect which prohibited the development and use of the property of Campsites as proposed by it. It is equally indisputable that at least three months prior to the enactment of the county zoning ordinance, Campsites purchased the property for the purpose of developing it as now proposed and immediately began its contemplated development with the intent to develop the entire tract as rapidly as possible, so as to take advantage of the spring and summer market for the sale of the contemplated camp sites. It is likewise indisputable that extensive work on the property itself, including the engineering and staking of roads and lots, the cutting and clearing of trees and the grading and opening of roads, occurred throughout several weeks prior to the enactment of the ordinance and was still in progress when the ordinance was enacted and that, for the purchase of the land, engineering, legal work, and the above mentioned construction work on the property itself, Campsites expended, or obligated itself to expend, in excess of $250,000. Nothing in the record of the hearing before the Board of Adjustments suggests that, at the time Campsites embarked upon this project, made these expenditures and undertook these contractual obligations, any specific proposal for a zoning ordinance had been reported to the County Board of Commissioners by the Planning Board, had been publicized by the county or had otherwise been brought to the attention of Campsites or of its president, Mr. Darnley.

Campsites does not contend that the Stanly County Zoning Ordinance was not duly adopted or that it is, in any respect, invalid. It contends that this valid ordinance has no application to its proposed development of its land, for the reason that such development was in progress when the ordinance was adopted and, consequently, it has a vested right to continue its development as a nonconforming use of its property.

In a number of recent decisions, this Court has dealt with the right of one, to whom a municipality has issued a building permit and who, in reliance thereon, has commenced construction or has incurred substantial expenditures or contractual obligations preparatory to such construction, to proceed with the construction, notwithstanding revocation of such permit by a

valid, subsequently enacted zoning ordinance. See: *Keiger v. Board of Adjustment*, 281 N.C. 715, 190 S.E. 2d 175; *Town of Hillsborough v. Smith*, 276 N.C. 48, 170 S.E. 2d 904; *Warner v. W & O, Inc.*, 263 N.C. 37, 138 S.E. 2d 782; *Stowe v. Burke*, 255 N.C. 527, 122 S.E. 2d 374. The only significance of the building permit in those cases was that such permit was required, under the ordinance in effect at the time of its issuance, in order to make the proposed use of the property lawful. In the present instance, there was no county ordinance or other law in effect at the time Campsites began its development of its property which required Campsites to obtain a permit therefor. It was then lawful for Campsites to proceed as it did. Consequently, those decisions declare the law applicable to the present case.

In *Warner v. W & O, Inc., supra,* Justice Rodman, speaking for this Court, said, "The law accords protection to nonconforming users who, relying on the authorization given them, have made substantial expenditures in an *honest belief* that the project would not violate *declared* public policy." (Emphasis added.) In *Town of Hillsborough v. Smith, supra,* we said:

> "In order to acquire a vested right to carry on such nonconforming use of his land, it is not essential that the permit holder complete the construction of the building and actually commence such use of it before the revocation of the permit, whether such revocation be by the enactment of a zoning ordinance or otherwise. To acquire such vested property right it is sufficient that, prior to the revocation of the permit or enactment of the zoning ordinance and with the requisite good faith, he make a substantial beginning of construction and incur therein substantial expense."

[3] In this respect, it is not material whether the proposed development and use of the land be the construction of a building or some other type of development, such as construction of recreational facilities, roads, water and sewer lines and the grading, clearing and development of sites for the proposed use of the property. In this respect, there is no basis for distinction between the actual expenditure of money and the incurring of binding contractual obligations for such expenditure, or between expenditures for the acquisition of the land, for the acquisition of building materials or services and for the making

---

---

of visible, physical changes in the condition of the land. *Town of Hillsborough v. Smith, supra.* In that case we said:

> "It is not the giving of notice to the town, through a change in the appearance of the land, which creates the vested property right in the holder of the permit. The basis of his right to build and use his land, in accordance with the permit issued to him, is his change of his own position in bona fide reliance upon the permit. * * *

> "We, therefore, hold that one who, in good faith and in reliance upon a permit lawfully issued to him, makes expenditures or incurs contractual obligations, substantial in amount, incidental to or as part of the acquisition of the building site or the construction or equipment of the proposed building for the proposed use authorized by the permit, may not be deprived of his right to continue such construction and use by the revocation of such permit, whether the revocation be by the enactment of an otherwise valid zoning ordinance or by other means, and this is true irrespective of the fact that such expenditures and actions by the holder of the permit do not result in any visible change in the condition of the land."

In the present case, there was a clearly visible change in the condition of the land as a result of the activities of Campsites in the clearing and construction of roadways and in the staking out of lots. Substantial expenditures and obligations were made and incurred. If these were made and incurred in good faith, the adoption of the county zoning ordinance on 16 April 1973 did not deprive Campsites of its preexisting right to so develop and use its land.

In *Warner v. W & O, Inc., supra,* we said:

> "The law * * * does not protect one who makes expenditures with knowledge that the expenditures are made for a purpose declared unlawful by duly enacted ordinance. * * * Nor does it protect one who waits until after an ordinance has been enacted forbidding the proposed use and, after the enactment, hastens to thwart the legislative act by making expenditures a few hours prior to the effective date of the ordinance."

In *Keiger v. Board of Adjustment, supra,* we said:

> "When, at the time a builder obtains a permit, he has knowledge of a pending ordinance which would make the

authorized construction a nonconforming use and there-after hurriedly makes expenditures in an attempt to acquire a vested right before the law can be changed, he does not act in good faith and acquires no rights under the permit."

In *Stowe v. Burke, supra,* at the time the landowner's ex-penditures were made, the city's planning board had already proposed to the city council the ordinance which was, in fact, adopted and notice had been published of the meeting of the city council to consider its adoption, it was held that the landowner, having made his expenditures with knowledge of these circum-stances, had not acted in good faith and, therefore, was properly enjoined from proceeding with the proposed construction.

In *Town of Hillsborough v. Smith, supra,* we said:

"The 'good faith' which is requisite under the rule of *Warner v. W & O, Inc., supra,* is not present when the landowner, with knowledge that the adoption of a zoning ordinance is imminent and that, if adopted, it will forbid his proposed construction and use of the land, hastens, in a race with the town commissioners, to make expenditures or incur obligations before the town can take its contem-plated action so as to avoid what would otherwise be the effect of the ordinance upon him."

[4] In the present case, the evidence in the record of the hear-ing before the Board of Adjustments does not show that Camp-sites, or its president, had any knowledge of any specific zoning ordinance under consideration by the Board of County Com-missioners at the time it acquired and began the development of its property. Indeed, it does not appear from the record of that hearing that the County Planning Board, itself, had deter-mined what zoning restrictions it would recommend to the county for the area including the land now owned by Campsites.

It is clearly shown in the record that the development of the property by Campsites was well under way before it was made aware of any opposition to its project and was begun when Campsites knew no more concerning the county's plans for zoning than that a general consideration of zoning of the entire rural portion of the county was in progress by the Planning Board. It clearly appears from the record of the hearing before the Board of Adjustments that the reason for Campsites' pro-ceeding speedily with its development was not to win a race with

the proponents of zoning but to get its property in condition to take advantage of the spring and summer market for the sale of camp sites. We find nothing whatever in the record of the hearing before the Board of Adjustments to indicate that, in this development of its property, Campsites proceeded, in manner or in time, differently from the way in which it would have proceeded had there been no consideration whatsoever of zoning by the county authorities.

[5, 6]   The statement by Mr. Darnley, at the hearing on 16 April 1973, several months after the development was begun, that he was aware that zoning, "had been in the planning stage for a year or so" and that he was "trying to beat it," does not show bad faith by Campsites in proceeding with its proposed development. The right of landowners to develop their properties in ways then lawful cannot be frozen by a county's or a municipality's announcement of its undertaking of a general study of zoning which, at some future date, may or may not lead to the adoption of an ordinance restricting the landowner's proposed use of his land. The statement that Mr. Darnley was trying to "beat" the proposed zoning is ambiguous at best. It was made several months after his development of the property began and was made at a hearing which he was attending for the purpose of seeking to defeat the adoption of a proposed zoning ordinance. It falls far short of evidence of bad faith such as was contemplated by the decisions of this Court above mentioned.

The finding of the Board of Adjustments, above quoted, that the applicant has failed to sustain its claim that the substantial expenditures and obligations made and incurred by it were made in good faith is not supported by the evidence in the record.

[7]   The evidence at the hearing before the Board of Adjustments shows clearly that the detailed map of the project was prepared in eight sections solely in order to permit the use of a scale sufficient to make the map readable. All of the evidence shows it was, from the outset, the intent of Campsites to develop the entire property as promptly as possible without interruption and without regard for section boundaries. Clearly, the plan was to proceed with the cutting of trees, the grading, the laying out of roads and lots across the entire tract as one project. Obviously, such work must have some starting point and cannot feasibly be carried on throughout the entire 155 acres simul-

taneously. Nothing in the present record indicates a plan by Campsites to develop its property in separate stages. Consequently, *In re Tadlock*, 261 N.C. 120, 134 S.E. 2d 177, has no application to the present case.

We affirm the judgment of the Court of Appeals which reversed the judgment of the Superior Court and remanded the matter to the Superior Court with the direction that it enter judgment declaring the entire development in question to be a nonconforming use to which the county zoning ordinance of 16 April 1973 does not apply.

Affirmed.