430 S.E.2d 341

**H.R.D.E., INC., Petitioner Below, Appellant,**

v.

**ZONING OFFICER OF the CITY OF ROMNEY and the City of Romney, Respondents Below, Appellees.**

**No. 21346.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 26, 1993.

Decided April 26, 1993.

---

**284**

Thomas P. Maroney, Robert M. Williams, Thomas P. Maroney, L.C., Charleston, for appellant.

Cathe Moreland, Moreland and Moreland, Romney, for appellees.

McHUGH, Justice:

This case is before the Court upon the appeal of H.R.D.E., Inc., the petitioner below, from the January 8, 1992 order of the Circuit Court of Hampshire County which concluded that the city council of the City of Romney correctly affirmed the order of the Board of Zoning Appeals which denied H.R.D.E., Inc. (hereinafter H.R.D.E.) a building permit for the construction of HUD (Housing and Urban Development) Section 202 property for the elderly and physically handicapped since the proposed structure is unlike any other in the adjacent area, violating article IX, section 909 of the City of Romney's Zoning Ordinance; is in excess of the height requirements provided in article VII of the zoning ordinance; and violates the parking space requirement set forth in article VII, section 704 of the zoning ordinance. The appellees and respondents below are the zoning officer of the City of Romney and the City of Romney.

The issue in this case is whether H.R.D.E.'s housing project for the elderly and physically handicapped is a nonconforming use even though the construction of the building has not yet begun. For reasons set forth herein, we reverse the order of the circuit court and find that the housing project is a nonconforming use.

I

H.R.D.E. (Human Resources Development and Employment, Inc.) is a West Virginia non-profit corporation which engages in the construction and management of housing projects for the elderly and physically handicapped. Prior to March 12, 1984, Homer Kincaid, the Executive Director for H.R.D.E., met with Larry Miller, the mayor of the City of Romney, to discuss the possibility of constructing a multi-unit apartment building for the elderly and physically handicapped in Romney. With the mayor's support, Mr. Kincaid presented his proposal to the city council of the City of Romney (hereinafter the city council) which formally gave its support to the project on March 12, 1984.

Relying on the support of the mayor and city council, H.R.D.E. began to work on making the project a reality. H.R.D.E. purchased two parcels of land in Romney for a total of $30,000.00. H.R.D.E. also purchased culverts and storm sewers for the access road in the amount of $7,145.32. This material was delivered and unloaded on the construction site in April of 1985.

However, H.R.D.E. lost the funding for the project in 1985 because certain documents were not timely sent to the Charleston HUD office. At that time H.R.D.E. offered to sell the property to the city since it was not in the business of owning property. The city declined to buy the property. In 1987 H.R.D.E. was approached about building housing for middle income families on the property. H.R.D.E. presented this project to the city council.

However, financing was not available for the middle income project, so H.R.D.E. once again in 1987 began the process of obtaining funds for the housing project for the elderly and physically handicapped, though the city council states that it was not informed of H.R.D.E.'s decision to continue working on the HUD housing project.

On July 9, 1987, H.R.D.E. deeded a portion of the property which was to be used as a public street to the City of Romney and gave the city the storm sewers at no charge. In the fall of 1987, the access road was developed and storm sewers and culverts were installed.

The City of Romney began the process of enacting a zoning ordinance in 1989. By a letter dated January 31, 1989, the mayor assured H.R.D.E. that its project would be grandfathered under the proposed zoning ordinance so that there would be no codes or restrictions which would apply to the project. Mr. Kincaid testified that he relied on the mayor's letter.[1] The mayor also drafted letters to H.R.D.E. in March of 1989 relating that the city would provide city services (such as police protection, snow removal, and water and sewer services) and would complete the street which had been given to the city by H.R.D.E. Although the Board of Zoning Appeals declined to make this a finding of fact, the mayor testified that he wrote the letter about grandfathering H.R.D.E.'s project based on a discussion with the city council; however, these discussions never appeared in the minutes of the city council.[2] Furthermore, the mayor testified that it was not uncommon for the minutes of the city

---

1. Below is the portion of testimony by Mr. Kincaid which indicates that he relied on the mayor's letter:

> Q. I specifically want to call your attention to Exhibit J, which is a letter dated January 31st, 1989, and the last paragraph of that.
>
> A. [by Mr. Kincaid] Exhibit J, dated January 31st, 1989, the last paragraph. I would deem your project to be under the grandfather clause, in which there would be no codes or restrictions that would apply.
>
> Q. And did you, in fact, rely upon that?
>
> A. Absolutely. We submitted it to our funding agent.

2. The following is taken from the mayor's testimony at the hearing before the board of zoning appeals:

> Q. Does that letter specifically state that?
>
> A. Last paragraph: I would deem your project to be under the grandfather clause in which there would be no codes and restrictions that would apply.
>
> Q. And did you write that letter—
>
> A. I did.
>
> Q. (continued) as Mayor of the town?
>
> A. I did. And that was based on discussion at city council meetings of some projects that was [sic] in the making at that time, specifically, three projects was [sic] discussed at various council meetings. This project....

council meetings to fail to reflect everything that was discussed at the meeting.[3]

The following facts regarding the expenses incurred by H.R.D.E. in the development of the building project for the elderly and physically handicapped are noticeably absent from the finding of facts made by the board of zoning appeals; however, we find the facts to be critical to our analysis of this case.[4] H.R.D.E. expended $1,000.00 in 1985 on surveys for the purpose of laying road and utility lines. The architect on the project had completed 90 to 95% of his work so H.R.D.E. is obligated for the entire amount of the contract which is $45,-000.00, according to the testimony of the architect. In 1988 H.R.D.E. expended $6,973.50 on extensive soil samplings and analysis. H.R.D.E. states that it has expended in excess of $95,000.00 on the project in acquiring property and employing services to prepare the site for construction.

On July 17, 1989, the City of Romney passed into law a "Comprehensive Plan for the City of Romney Planning and Zoning Ordinance" (hereinafter zoning ordinance). In August of 1989 H.R.D.E. submitted to the City of Romney a building permit application for the construction of a four-story, 32–unit apartment building which would house the elderly and physically handicapped. On September 5, 1989, Garry C. Buckbee, the building inspector, disapproved the application based upon articles V and VI, sections 501 ("Use Regulation for Residential District") and 601 ("Nonconforming Uses"), respectively, of the zoning ordinance. Mr. Buckbee's decision was eventually upheld by the board of zoning appeals, city council and the circuit court.

3. The mayor testified to the following:

Q. And are there any minutes that you can direct us to that would indicate that council had been discussing this and taken any action on it, even been made aware of the progress?
A. They were made aware of it at all times by myself. Whether the minutes reflect it or not, I don't know, because it's been common practice. There's a lot of discussions takes [sic] place at council meetings that does [sic] not get into the minutes.

4. The zoning appeals board rejected the evidence relating to the amount of money H.R.D.E.

## II

We first address H.R.D.E.'s contention that the building project for the elderly and physically handicapped is a nonconforming use which it has a right to continue. Based on the facts in this particular case, we agree with H.R.D.E.'s contention.

A nonconforming use is "[a] use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated[.]" 1 Robert M. Anderson, *American Law of Zoning 3d,* § 6.01, at 446 (1986). In West Virginia we have statutorily recognized a nonconforming use, and we have mandated that a nonconforming use cannot be prohibited if the purpose of the use remains the same after the ordinance is enacted. *W. Va. Code,* 8–24–50 [1985].[5] The City of Romney recognized that a nonconforming use may be continued in section 501 of the zoning ordinance which states, in part: "The lawful use of any building, structure, or land existing on the effective date of this Ordinance, or authorized by an improvement location permit issued prior thereto, may be continued, although such use does not conform with the provisions of this Ordinance."

In the case before us, the building project for the elderly and physically handicapped was started several years before the City of Romney enacted its zoning ordinance; however, the building itself was not completed nor started before the zoning ordinance was enacted. Thus, the issue is whether the actions of H.R.D.E. are sufficient to vest a nonconforming use.

had expended because it found that evidence to be immaterial.

5. *W.Va.Code,* 8–24–50 [1984] states, in part:
Such zoning ordinance or ordinances shall not prohibit the continuance of the use of any land, building or structure for the purpose for which such land, building or structure is used at the time such ordinance or ordinances take effect, but any alteration or addition to any land or any alteration, addition or replacement of or to any existing building or structure for the purpose of carrying on any use prohibited under the zoning rules and regulations applicable to the district may be prohibited[.]

This issue is one of first impression in this state. Generally, "[a] use which is planned rather than actually commenced prior to the enactment of a restrictive ordinance is not an existing use which is entitled to continue." Anderson, *supra* § 6.23, at 511. For instance, in *Sanderson v. Town of Greenland,* 122 N.H. 1002, 453 A.2d 1285 (1982), the court found that site improvements which are preliminary in nature will not cause a nonconforming use to vest. In *Sanderson* the plaintiffs had not constructed any buildings on their subdivision prior to the amendment of the ordinance, but the plaintiffs had cleared the property, built a rough road, dug drainage ditches, and installed pipelines.

"However, the right to nonconforming use is determined on a case-by-case basis, and the courts have occasionally found a vested right to exist where something less than actual use has occurred." Anderson, *supra* § 6.23, at 514. In those cases where the courts have found a vested right to exist where something less than actual use has occurred, the courts have usually also found that substantial costs toward the completion of the project have been incurred or that there has been a change in position relative to the erection of a building or establishment of a business. 8A Eugene McQuillin, *Municipal Corporations* § 25.188 (3d ed. 1986). *See Boise City v. Blaser,* 98 Idaho 789, 572 P.2d 892 (1977); *American National Bank and Trust Co. of Chicago v. City of Chicago,* 19 Ill.App.3d 30, 311 N.E.2d 325 (1974); *In re Campsites Unlimited, Inc.,* 287 N.C. 493, 215 S.E.2d 73 (1975); *Clackamas County v. Holmes,* 265 Or. 193, 508 P.2d 190 (1973). *But cf. Lutz v. New Albany City Plan Comm'n,* 230 Ind. 74, 101 N.E.2d 187 (1951) (there is no vested right to a nonconforming use when the building has not been constructed and the work has only been preliminary); *State ex rel. Marwell, Inc. v. Dodge,* 113 Ohio App. 118, 177 N.E.2d 515 (1960) (where there were no buildings on the property the site preparation did not constitute a substantial nonconforming use).

We agree that the question of whether a nonconforming use has vested should be decided on a case-by-case basis. We also agree that although mere site preparation generally does not vest a nonconforming use, there are circumstances in which a nonconforming use can vest even though actual use of the property has not occurred. One question remains—how do you determine when a nonconforming use vests?

Some courts have attempted to come up with factors to be weighed when determining whether the right to a nonconforming use vests. *Anderson, supra* § 6.08, at 467. We think there should be factors which are weighed when determining whether a nonconforming use has vested in order to ensure fairness. Furthermore, we like the following factors established by the Supreme Court of Oregon in *Clackamas County v. Holmes,* 265 Or. 193, 508 P.2d 190, 192–93 (1973):

The test of whether a landowner has developed his land to the extent that he has acquired a vested right to continue the development should not be based solely on the ratio of expenditures incurred to the total cost of the project. We believe the ratio test should be only one of the factors to be considered. Other factors which should be taken into consideration are the good faith of the landowner, whether or not he had notice of any proposed zoning or amendatory zoning before starting his improvements, the type of expenditures, i.e., whether the expenditures have any relation to the completed project or could apply to various other uses of the land, the kind of project, the location and ultimate cost. Also, the acts of the landowner should rise beyond mere contemplated use or preparation, such as leveling of land, boring test holes, or preliminary negotiations with contractors or architects.

In *Clackamas* the county attempted to enjoin the defendants from completing construction of a chicken processing plant on the grounds that the construction violated county zoning. The defendants had not yet constructed the plant; however, they had drilled a well, purchased an irrigation sys-

tem, installed electrical power, planted grass, and spent approximately $33,000 toward the development of the property prior to the adoption of the county zoning ordinance. *Id.* 508 P.2d at 191. Based on the above factors the court in *Clackamas* found that the landowners had a vested right to continue the nonconforming use since the well on the property of the planned chicken-processing plant provided more water than normal for an ordinary farm, since special arrangements had been made for electrical power and transformers, and since the landowners had expended at least $33,000 toward the project. *Id.*, 508 P.2d at 193.

Likewise, in the case before us, H.R.D.E. had engaged in more than just "preliminary negotiations" with its architect. In fact, H.R.D.E. had to pay $45,000 to the architect who had completed more than 90% of his work which obviously would be related to designing a building which would meet the special needs of the elderly and physically handicapped. H.R.D.E. had also installed storm sewers and culverts, conducted extensive soil samplings and conducted surveys for the purpose of laying utility and road lines. All together, H.R.D.E. had expended approximately $95,-000 before the zoning ordinance became effective which also indicates that the actions of H.R.D.E. "rise beyond mere contemplated use or preparation."

Furthermore, there is no indication that H.R.D.E. acted in bad faith. H.R.D.E. started this project in 1984, and although H.R.D.E. had contemplated alternative projects when it lost the funding for the HUD project in 1985, H.R.D.E. did actively pursue this project again in 1987 and even deeded property which was to be a public street to the City of Romney in 1987. Most of H.R.D.E.'s work on the project which was completed before H.R.D.E. applied for a building permit occurred before the zoning ordinance took effect in 1989. The City of Romney began the process of enacting the zoning ordinance in 1989. Therefore, H.R.D.E. worked on the project from 1987 until early 1989 without any official contemplation of a zoning ordinance which would affect the project. We find that H.R.D.E. acted in good faith.

■ In summary, we hold that although the right to a nonconforming use when there is something less than actual use is generally determined on a case-by-case basis, the following factors are to be weighed when determining whether or not a landowner has acquired a vested right to a nonconforming use: (1) whether the landowner has made substantial expenditures on the project; (2) whether the landowner acted in good faith; (3) whether the landowner had notice of the proposed zoning ordinance before starting the project at issue; and (4) whether the expenditures could apply to other uses of the land. Mere contemplated use or preparation or preliminary negotiations with contractors or architects will not vest the right to a nonconforming use.

■ Therefore, in this case the landowner has a vested right to complete the project as a nonconforming use when the landowner acted in good faith while expending approximately $95,000 in preparing for the construction of a specially designed building for the elderly and physically handicapped before the municipality enacted a zoning ordinance. We emphasize that in this particular case the landowner's acts went beyond mere contemplated use or preparation.

■ In syllabus point 5 of *Wolfe v. Forbes*, 159 W.Va. 34, 217 S.E.2d 899 (1975), this Court stated: "While on appeal there is a presumption that a board of zoning appeals acted correctly, a reviewing court should reverse the administrative decision where the board has applied an erroneous principle of law, was plainly wrong in its factual findings, or has acted beyond its jurisdiction." We think the board of zoning appeals applied an erroneous principle of law by not considering factors such as those discussed in *Clackamas, supra,* which would indicate whether a nonconforming use can vest when something less than actual use has occurred. Before the zoning ordinance was effective, we find that H.R.D.E.'s actions went beyond the

mere contemplated use of the property. We also find that the amount of money expended was significant in indicating whether the project was merely contemplated or far enough along to vest a nonconforming use. On that basis, we reverse the decision of the circuit court which affirmed the order of the board of zoning appeals since we find that the board of zoning appeals was plainly wrong in its factual findings and applied a clearly erroneous principle of law.

### III

In light of our resolution of the nonconforming use issue, it is not necessary for us to fully address the following two issues raised by H.R.D.E.: (1) did the board of zoning appeals err by not finding that the City of Romney was estopped from denying the building permit under the principle of equitable estoppel, (2) did the board of zoning appeals err by refusing to grant a variance as set forth in the zoning ordinance.[6]

### IV

Based upon the foregoing, the January 8, 1992 order of the Circuit Court of Hampshire County is reversed.

Reversed.

---

6. Although it is not necessary for us to address whether equitable estoppel applies in this case, we would like to point out that although the record is vague, it does not indicate that the mayor had authority to tell H.R.D.E. that the project was grandfathered. The general rule is that "[a] municipality is not estopped ... by the unauthorized act of an officer, as, for example, in issuing a permit in violation of a zoning or other ordinance." 9A Eugene McQuillin, *Municipal Corporations* § 27.56, at 430 (3d ed. 1986) (footnotes omitted). *See also City of San Marcos v. R.W. McDonald Development Corp.,* 700 S.W.2d 674, 676 (Tex.Ct.App.1985). Therefore, since the mayor was not authorized to assure H.R.D.E. that the project would be grandfathered, the doctrine of equitable estoppel will not apply in this case.