VERNON FINCH, JUATINA FINCH, DANIEL J. BULLARD AND CHRISTINE
BULLARD v. THE CITY OF DURHAM, NORTH CAROLINA

No. 85PA89

(Filed 5 October 1989)

**1. Eminent Domain § 1.3 (NCI3d) — taking private property for
public use — just compensation — law of the land clause**

Although the North Carolina Constitution does not con-
tain an express provision prohibiting the taking of private
property for public use without payment of just compensation,
the Supreme Court has inferred such a provision as a fun-
damental right integral to the "law of the land" clause in
Art. I, § 19 of the N. C. Constitution.

**Am Jur 2d, Eminent Domain §§ 13, 19.**

**2. Municipal Corporations § 30.5 (NCI3d) — whether rezoning is
taking — practical use and reasonable value**

The test for determining whether a taking has occurred
in the context of a rezoning is whether the property as rezoned
has a practical use and a reasonable value.

**Am Jur 2d, Zoning and Planning § 13.**

**3. Municipal Corporations § 30.5 (NCI3d) — rezoning — practical
use and reasonable value — owner's investment not determina-
tive**

The property owner's actual investment in the property
prior to a rezoning is not determinative of "practical use"
and "reasonable value" of the property after rezoning.

**Am Jur 2d, Zoning and Planning § 21.**

**4. Municipal Corporations § 30.5 (NCI3d) — rezoning — depriving
owner of previous property rights**

A taking does not occur simply because government action
deprives an owner of previously available property rights.

**Am Jur 2d, Zoning and Planning § 21.**

**5. Municipal Corporations § 30.7 (NCI3d) — rezoning — expendi-
tures in reliance upon prior ordinance**

When a property owner makes expenditures in the absence
of zoning or under the authority of a building permit, subse-

quent changes in the zoning of the property may not prohibit the resulting nonconforming use. However, where an investor knows of a pending ordinance change proposed by a city planning board to the city council, the investor has no valid claim that he relied upon the prior ordinance in guiding his investment decision.

**Am Jur 2d, Zoning and Planning §§ 72, 287.**

6. **Municipal Corporations § 30.7 (NCI3d) — investment expectations in zoned property — purchase with knowledge of rezoning recommendation**

Plaintiffs did not have a reasonable expectation of an investment return untroubled by zoning changes on a 2.6-acre tract which they planned to use as a motel site where they chose to exercise their option to purchase the property some twenty-seven days after they knew of a recommendation by a city planning and zoning commission to rezone the property from an office-institutional to a residential classification.

**Am Jur 2d, Zoning and Planning § 72.**

7. **Municipal Corporations § 30.7 (NCI3d) — rezoning not an unconstitutional taking**

The rezoning of plaintiffs' 2.6-acre tract from O-I to R-10 did not amount to a taking under the N. C. Constitution or the U. S. Constitution because (1) the ordinance has sufficient foundation in reason and bears a substantial relation to the public welfare, and (2) the property as rezoned retains both practical use and reasonable value, where the public purpose of protecting an existing neighborhood from commercial encroachment was substantially advanced by the rezoning ordinance; the gravamen of plaintiffs' claim is that the available uses and value of their property under the R-10 zoning are not comparable to its value for plaintiffs' proposed motel use under O-I in either market appeal or market price; plaintiffs' own evidence showed that several uses permitted under R-10 zoning could be made of the property, such as residential, day care, or church use, and even though the market for these uses would not be strong, certain of these uses could command a substantial sales price for the property; and plaintiffs' evidence showed that the property could have been sold undeveloped for between $20,000 and $25,000 at the time of trial.

**Am Jur 2d, Zoning and Planning §§ 13, 21.**

**8. Municipal Corporations § 30.7 (NCI3d) — taking by rezoning — federal civil rights claim — insufficient forecast of evidence**

Plaintiffs' forecast of evidence was insufficient for submission of an issue of a taking by rezoning to the jury in an action brought under 42 U.S.C. § 1983.

**Am Jur 2d, Civil Rights § 16.**

**9. Municipal Corporations § 30.7 (NCI3d) — rezoning not arbitrary or capricious**

The 1985 rezoning of plaintiffs' 2.6-acre tract from O-I to R-10 was not arbitrary, capricious or unreasonable as applied to plaintiffs so as to render the rezoning ordinance invalid where the evidence showed that a 1979 rezoning of plaintiffs' property from R-10 to O-I removed the property from residential zoning and made it a virtual island of commercially or institutionally zoned land in a large and stable residential area and contravened defendant city's policy of preserving residential neighborhoods; the 1985 ordinance returned the property to its prior zone in conformity with the remainder of the neighborhood; and plaintiffs had acquired no vested right to proceed with their proposed development of the property because they had neither obtained a building permit nor begun actual construction in good faith reliance on the existing zone.

**Am Jur 2d, Zoning and Planning § 15.**

Justice MARTIN concurring.

Chief Justice EXUM dissenting.

Justices FRYE and WEBB concur in the dissenting opinion of the Chief Justice.

Justice FRYE dissenting.

ON discretionary review prior to determination by the Court of Appeals pursuant to N.C.G.S. § 7A-31(a) and Rule 15(e)(2) of the Rules of Appellate Procedure of a judgment upon (1) a jury verdict that a taking had occurred; (2) a judicial determination that the taking was not arbitrary or capricious; and (3) an alternative judicial determination that a taking had occurred, which invalidated one city ordinance and waived another, awarded damages and granted attorney's fees and costs to plaintiffs, entered by *Bowen*,

## FINCH v. CITY OF DURHAM

[325 N.C. 352 (1989)]

*J.*, at the 14 March 1987 Civil Session of Superior Court, DURHAM County. Heard in the Supreme Court 9 May 1989.

*Mount White Hutson & Carden, P.A., by Richard M. Hutson, II, and Stephanie C. Powell, and Maxwell, Martin, Freeman and Beason, P.A., by James B. Maxwell, for plaintiff-appellees and cross-appellants.*

*Office of the City Attorney, by Karen A. Sindelar, Assistant City Attorney, for defendant-appellant and cross-appellee.*

*North Carolina League of Municipalities, by S. Ellis Hankins, General Counsel, and Andrew L. Romanet, Jr., Assistant General Counsel, amicus curiae.*

*City of Charlotte, by Henry W. Underhill, Jr., City Attorney, and City of Greensboro, by Jesse L. Warren, City Attorney, amici curiae.*

*City of Wilmington, by Thomas C. Pollard, City Attorney, and Robert W. Oast, Jr., Assistant City Attorney, amicus curiae.*

*Erdman, Boggs & Harkins, by Harry H. Harkins, Jr., for Watts Hospital-Hillandale Neighborhood Association, Inc., amicus curiae.*

MEYER, Justice.

This is a dispute over the Durham City Council's rezoning of a 2.6-acre, vacant, undeveloped tract ("the property") near the southeastern quadrant of the intersection of Interstate 85 ("I-85") and Hillandale Road in Durham. The evidence at trial tended to show that until 1979 all the land south of I-85 in this area was zoned R-10 (residential, minimum 10,000 square foot lot). However, from 1979 to 1985, the property in question was zoned O-I (office-institutional). On 6 May 1985, the Durham City Council zoned the property and an adjacent one-acre tract back to R-10.

The property is on the edge of the Watts-Hillandale neighborhood. It is in the shape of a reverse "L," when viewed with its northern boundary abutting I-85 and its western boundary facing Hillandale Road. Across I-85 to the north, there is office-institutional and commercial zoning, including hotels. South of I-85 and surrounding the property to the east, south, and west, there is residential R-10 zoning, in which single-family houses have been built. A church is located across the street from the property, and a Mobil gas station, previously zoned C-1 (neighborhood com-

mercial) but now abandoned and rezoned to R-10, is situated immediately adjacent to the west.

In 1972, an attempt was made to rezone the property from R-10 to O-I, but it failed. In 1979, plaintiffs, who had a contract for an option to lease with the lease to contain an option to purchase the property, initiated a request to rezone it to O-I in order to build a 100-room motel on the site. The Durham City Council approved plaintiffs' rezoning request, and the property was rezoned to O-I. Immediately thereafter, plaintiffs entered into a seven-year lease with the property owner with an option to purchase the property in the final year. Under a subsequent amendment to the lease, plaintiffs paid $15,000 each year from 1 March 1979 through 1 March 1984. The lease ran through 30 June 1985. Plaintiffs had to give notice of their intent to exercise their option by 1 May 1985 and had to close by 30 June 1985 if they wished to purchase the property. The purchase price was $165,000.

Plaintiffs planned to build a motel on the property immediately following the 1979 rezoning to O-I. Although plaintiffs paid for architectural plans and a cash flow study, high interest rates and a lack of partners prevented them from building the motel. No physical developments or improvements were made on the land.

In late 1984, Red Roof Inns expressed an interest in leasing or buying the property for motel use. Plaintiffs and Red Roof Inns executed an agreement whereby once plaintiffs had purchased the property, Red Roof Inns would construct a motel and then lease the property from plaintiffs. Red Roof Inns submitted some informal schematic sketches to the Durham City Planning Department. The motel could not be built, however, unless the Durham City Council closed the unimproved (and, in fact, never actually opened) Chesterfield Street adjacent to the east side of the property. Plaintiffs submitted a petition to close Chesterfield Street. On 1 March 1985, before the street closing was presented to the Durham City Council, the Watts-Hillandale Neighborhood Association and other individuals living in the general area of the property petitioned to rezone the property and the adjacent gas station tract back to R-10. The street closing was delayed until the rezoning could be acted upon, and plaintiffs withdrew their request to close Chesterfield Street in April 1985.

Rezoning requests in Durham are processed by the planning staff, which prepares an advisory report for the Planning and Zon-

ing Commission. The Commission then holds a public hearing and makes an official recommendation to the City Council. The advisory report and the Commission recommendation then go to the City Council, which holds another public hearing before voting. The report in this instance noted that the existing O-I zoning for the property and C-1 zoning for the Mobil tract were undesirable because of excessive traffic, noise, and light that could be generated. The report recommended two "intermediate" uses — limited office institutional (O-I-L) and medium-density clustered residential development — which would help to buffer the existing neighborhood and at the same time allow for more intense use of the property than R-10. The report noted, however, that these uses would be appropriate only if the property owners were to submit a development plan, which under the Durham City Code and the relevant ordinance would commit the developer to a specific site plan for development. Such a development plan can only be submitted by the property owner. The report noted that despite the planning staff's belief that the two intermediate zones were most appropriate for the property, the staff nevertheless recommended that the zoning of the property that plaintiffs were leasing should remain O-I because a development proposal had already been initiated by the submission of the Chesterfield Street closing petition. The report recommended that the Mobil tract be rezoned to O-I.

On 2 April 1985, after presentation of the report and a public hearing, the Planning and Zoning Commission recommended by a 5 to 2 vote that the property be rezoned to R-10. A hearing before the Durham City Council was scheduled for 6 May 1985.

On 26 April 1985, plaintiffs' agreement with Red Roof Inns expired, without the latter having exercised its option to lease the property. On 29 April 1985, plaintiffs notified the owner of the property that they were exercising their option to purchase the property. On 6 May 1985, after a hearing, the Durham City Council voted 11 to 2 to rezone both the property and the Mobil tract to R-10. It also voted 13 to 0 to deny a request to rezone a separate nearby tract from R-10 to O-I. On 26 June 1985, plaintiffs closed on the property at issue here, paying the purchase price of $165,000. In July 1985, plaintiffs entered into a contract with Red Roof Inns to sell the property for $500,000 if the property were again rezoned to O-I, thus allowing Red Roof Inns to construct a motel. However, no petition for a rezoning back to O-I was filed either by plaintiffs or Red Roof Inns. On 3 September 1985, the

Durham City Council passed a general ordinance requiring hotels locating in O-I or C-1 districts to seek a use permit from the Durham City Board of Adjustment.

R-10 zones are the most typical residential zones in the urban area of Durham. Uses permitted in an R-10 zone include single-family houses, athletic fields, cemeteries, mausoleums, child care centers, churches, clubs or private lodges, noncommercial community buildings, family care homes, parking lots, public buildings, libraries, museums, art galleries, parks, recreational facilities, public or private swimming pools, and schools, including nursery schools and kindergartens. Single-family homes are permitted as a matter of right, unless they are located on lots that are too small under the zoning code, in which case a use permit (in similar ordinances, sometimes referred to as a "variance") is required from the Board of Adjustment. The nonresidential uses permitted in an R-10 zone require a use permit, except for churches, which did not require a use permit until 1987.

On 8 November 1985, plaintiffs instituted this action against the City of Durham for a declaratory judgment and damages. Plaintiffs stated six claims: (1) that the zoning ordinance be invalidated as arbitrary, capricious, discriminatory and unreasonable; (2) that the zoning ordinance be invalidated as a "taking" under the state and federal Constitutions; (3) that the City of Durham be found liable for inverse condemnation under N.C.G.S. § 40A-51, and pay damages of $700,000; (4) that the City of Durham be estopped from enforcing the zoning ordinance and the subsequent general ordinance requiring a use permit; (5) that should the zoning ordinance be invalidated, the City of Durham be found liable for a "temporary taking" and plaintiffs be compensated under N.C.G.S. § 40A-51 in the amount of $100,000; and (6) that the City of Durham be found liable under 42 U.S.C. § 1983 for a taking and compensate plaintiffs in the amount of $700,000 and costs and attorney's fees.

The City of Durham moved for summary judgment on all claims except the first (zoning arbitrary and capricious). On 15 July 1986, the trial court granted the City's motion on the third (inverse condemnation), fourth (estoppel) and sixth (taking under 42 U.S.C. § 1983) claims. On 14 March 1987, the motion on the first claim (zoning arbitrary and capricious) was heard by the court and allowed, and the second (taking under state and federal Constitutions) and fifth (temporary taking) claims were tried before a jury.

Further evidence was presented as follows. The property purchased by plaintiffs could be developed into one single-family home without a use permit. An additional five lots could be created on the back portion of the property fronting on Chesterfield Street without a permit. With a permit, plaintiffs could build two houses instead of one fronting Hillandale Road and six houses instead of five fronting on Chesterfield Street, or apply for a permit for any of the nonresidential uses permitted in an R-10 zone fronting on Hillandale Road.

Two experts testified for plaintiffs. Ralph Cochran testified that the highest and best use for the property in 1985 and at the time of trial was O-I. With regard to uses for the property under R-10, Cochran testified that it was suitable for one to two rental houses fronting on Hillandale Road, but he questioned whether an investor would buy the property for such use. If the entire property were developed, six to eight houses could be built, but constructing a new road and utilities to the back portion of the property would cost a developer $121,500 above the cost of the land, so that each new lot would sell for $13,500. Cochran also testified that the site would work well for a church, though the number of buyers would be limited; that the site was topographically suited for a day care center or family care home, though noise and traffic would be a deterrent; and that there was not much market for community buildings. His ultimate opinion was that the property was not suitable for other R-10 development and that the rezoning had deprived plaintiffs of all reasonable, practical and beneficial use of the property. Finally, Cochran testified that the property's value for hotel use under O-I on 6 May 1985, the date of rezoning, was $520,000 and that at the time of trial the hotel market had appreciated by 20%, but that under the R-10 zoning, the property was worth only $20,000.

On cross-examination, Cochran testified that the property's value for a rest home would exceed $20,000; that its value for a church would be between $100,000 and $200,000; that other uses, such as for apartments and offices, would require a rezoning from R-10, but that these were suitable and practical since they would give the property greater value. He agreed that such uses existed nearby to the north of I-85.

Plaintiffs' second expert, Frank Ward, testified that the highest and best use of the property was for a hotel. He stated that it

was not economically feasible to develop the property into more than one single-family lot. Ward testified that the property's value for hotel use under O-I in 1985 was $550,000, but that its value for speculative use under R-10 was $25,000. With regard to church use, he stated that most churches wish to locate on three acres, but if the price of the property were sufficiently low, a church might find it attractive. The highest price that he had known a church to pay was $20,000 per acre. Ward testified that the property's location was not practical for a day care center under normal circumstances, but that such a center might "jump right in at $25,000." He considered the other uses available by permit under R-10 to be impractical or not much in demand.

Plaintiff Vernon Finch testified as to plaintiffs' efforts to develop a motel on the property from 1979 to 1985. Despite their knowledge of the Planning and Zoning Commission's recommendation that the property be rezoned to R-10, plaintiffs exercised their option to purchase because of their financial investment in the property. On cross-examination, Finch testified that since the rezoning to R-10, plaintiffs had not requested a rezoning or sought any use permits. Plaintiffs had put a sign on the property in late 1986 in an effort to sell it, but he did not think it necessary to list the property or advertise it or send letters or flyers to possible buyers. After the sign was put up, twenty-five to thirty persons had verbally contacted Finch, including people interested in a church and a child care facility. A price of between $100,000 and $150,000 was discussed for the latter, although plaintiffs' asking price for the property was $750,000. Plaintiffs received no formal offers to buy the property. The sign fell down in less than one year.

Plaintiffs presented general testimonial evidence that traffic conditions on Hillandale Road had worsened since 1979, rendering residential use there undesirable. A state employee testified that traffic counts on Hillandale Road and I-85 had increased from 1979 to 1986.

The City of Durham presented evidence that single-family homes and R-10 zones exist adjacent to other busy streets in Durham with traffic counts similar to or higher than those on Hillandale Road. The City presented a large map showing that the dominant zoning along I-85 is residential. Three of the four I-85 interchanges are zoned residential on one side and commercial on the other.

Elizabeth Rooks, Associate Director of Current Planning for the City, testified. She explained that the planning staff considered that the O-I and C-1 zones should never have been placed to the south of I-85 and that the City of Durham has a policy of preserving residential neighborhoods. Rooks testified that, given the surrounding zoning pattern, it would be practical and reasonable to build one or two houses on the part of the property fronting Hillandale Road. She further testified that the "ideal" zoning for the property would be an intermediate use such as clustered residential, but a development plan would have to be submitted by plaintiffs for such use. Finally, Rooks testified that the property could appropriately be used for a day care center or a church. Large day care centers exist on other major streets in Durham with higher traffic counts than on Hillandale Road. A church would not have required a use permit to locate on the property until 1987.

Paul Norby, the City's Director of Planning and Community Development, also testified. He stated that a key element in zoning is that clear dividing lines between zoning districts allowing for different land uses are necessary to prevent a "domino" effect from occurring. I-85 serves this purpose in Durham. In Norby's opinion, R-10 was an appropriate zone for the property because single-family neighborhoods can be preserved along major interstates and major roads. Norby testified that a day care center would be another appropriate use for the property because of its location on Hillandale Road, which is used by many commuters with young children in need of such a facility. Since 1984, the City of Durham has approved rezoning requests to multi-family or O-I-L with a development plan for properties comparable to plaintiffs' property. On cross-examination, Norby explained that the City Planning staff had recommended against rezoning the property to R-10, not because R-10 was an inappropriate land use, but because the staff considered a rezoning inappropriate since plaintiffs had already initiated the Chesterfield Street closing petition.

The City presented two experts who were not City employees. Tom Hay testified that the highest and best use for the property as zoned R-10 was for day care and that, based on property sales of comparable property in Durham for day care centers, the value of the property as of 6 May 1985 was $170,000. In his opinion, six months to a year would be needed to market the property for this use or other similar nonresidential uses. Wallace Kaufman testified that the property could be put to a variety of uses and

that it has significant value for many of the nonresidential uses allowed in an R-10 district. He testified that the property had a value of between $150,000 and $200,000 for day care use and could be sold in six months to a year.

At the close of plaintiffs' evidence, the City of Durham moved for a directed verdict, and both parties moved for a directed verdict at the close of all the evidence. The trial judge denied the motions. Two issues were submitted to the jury: (1) whether the rezoning ordinance was a taking and (2) the amount of damages, if any, that plaintiffs were entitled to recover. The trial judge reserved ruling on the issue of whether the rezoning ordinance was invalid as arbitrary, capricious, discriminatory and unreasonable.

The jury found that the rezoning ordinance was an invalid taking but that plaintiffs had suffered no damages. The trial judge then found that the rezoning ordinance should not be invalidated as arbitrary, capricious, discriminatory and unreasonable. Both parties filed post-trial motions for judgment notwithstanding the verdict or, alternatively, a new trial. The trial judge denied the City's motions and granted plaintiffs' motion for judgment notwithstanding the verdict as to damages. The trial judge also granted two additional motions by plaintiffs: that the use permit needed for building a motel be waived and that plaintiffs be awarded costs and attorney's fees under N.C.G.S. § 40A-8(c). The judgment invalidated the rezoning ordinance, awarded plaintiffs $150,937.50 in damages, waived the use permit, and granted costs and attorney's fees of $61,598.61. The judgment included findings and conclusions to support an alternative judicial determination that a taking had occurred.

The City of Durham appealed, and plaintiffs cross-appealed to the Court of Appeals. Discretionary review prior to a determination by the Court of Appeals was allowed by this Court *ex mero motu* on 10 February 1989.

The City of Durham contends that the trial court erred in not granting the City's motions for a directed verdict and judgment notwithstanding the verdict on plaintiffs' state constitutional taking claim because, as the City puts it, "the rezoned property has positive value and can be used for some of the uses permitted in an R-10 district."

[1] We note initially that although the North Carolina Constitution does not contain an express provision prohibiting the taking

of private property for public use without payment of just compensation, this Court has inferred such a provision as a fundamental right integral to the "law of the land" clause in article I, section 19 of our Constitution. *Long v. City of Charlotte*, 306 N.C. 187, 196, 293 S.E.2d 101, 107-08 (1982).

The test to determine whether a taking has occurred is set forth in *Responsible Citizens v. City of Asheville*, 308 N.C. 255, 302 S.E.2d 204 (1983). There, a city ordinance imposed land-use regulations on property designated as a flood hazard district and required that new construction and substantial improvements made to properties in the flood hazard district be built so as to prevent or minimize flood damage. The plaintiffs owned commercial real property located in the flood hazard district. They brought a class action against the City of Asheville, claiming that the land-use regulations deprived them of the right to reasonable use of their property and caused it to depreciate to a fraction of its value. *Id.* at 256, 302 S.E.2d at 206. In essence, the plaintiffs challenged the enactment of the flood plain ordinance as an invalid exercise of the police power because it effected a taking of private property for public use.

This Court engaged in a two-part analysis to resolve the issue. We first applied an "ends-means" test to decide whether that particular exercise of the police power was legitimate, by determining whether "the ends sought, *i.e.*, the object of the legislation, is within the scope of the power," and then "whether the means chosen to regulate are reasonable." *Id.* at 261, 302 S.E.2d at 208. We concluded in *Responsible Citizens* that the ends sought under the ordinance fell well within the scope of the police power and that its enactment was reasonably necessary for the public health, safety and welfare. *Id.* at 263, 302 S.E.2d at 209. We then focused on whether the ordinance was invalid because the interference with the plaintiffs' use of the property amounted to a taking. We found guidance in *Helms v. City of Charlotte*, 255 N.C. 647, 122 S.E.2d 817 (1961), a case involving the validity of a zoning ordinance, wherein the Court stated:

"It is a general rule that zoning connot [sic] render private property valueless. The burdens of government must be equal. In other words, if the application of a zoning ordinance has the effect of completely depriving an owner of the beneficial use of his property by precluding all practical uses or the

> only use to which it is reasonably adapted, the ordinance is invalid . . . . A zoning of land for residential purposes is unreasonable and confiscatory and therefore illegal where it is practically impossible to use the land in question for residential purposes." McQuillin: Municipal Corporations, Vol. 8, s. 25.45, pp. 104, 105.

*Id.* at 653, 122 S.E.2d at 822. We noted that in *Helms*, the Court indicated that a zoning ordinance would be deemed unreasonable and confiscatory as applied to a particular piece of property if the owner "was deprived of *all 'practical' use* of the property and the property was rendered of *no 'reasonable value.'* " *Responsible Citizens*, 308 N.C. at 264, 302 S.E.2d at 210 (emphasis added). Although the plaintiffs could continue to use their commercial real estate in whatever way they were using it at the time it was rezoned to a flood hazard district, they argued that because they could not add to or change their current uses of the property except at prohibitive cost, and because the market value of the property had diminished, a taking had occurred. We rejected this argument.

> [A]ssuming that the cost of complying with the land-use regulations is prohibitive (and we do not decide that it is) and recognizing that the market value of plaintiffs' properties has diminished (a fact found by the trial court), these factors are of no consequence here. . . . "[T]he mere fact that an ordinance results in the depreciation of the value of an individual's property or restricts to a certain degree the right to develop it as he deems appropriate is not sufficient reason to render the ordinance invalid."

*Id.* at 265, 302 S.E.2d at 210 (quoting *A-S-P Associates v. City of Raleigh*, 298 N.C. 207, 218, 258 S.E.2d 444, 451 (1979)).

[2] In short, the test for determining whether a taking has occurred in the context of a rezoning is whether the property as rezoned has a practical use and a reasonable value. *See Helms v. City of Charlotte*, 255 N.C. 647, 122 S.E.2d 817 (rezoning of two lots from industrial to residential could constitute a taking where topography and lot size imposed such severe restraints that only a house requiring foundation and roof variation for each room could be built; case remanded for findings as to whether market value of residence would be less than cost of constructing same); *Sherrill v. Town of Wrightsville Beach*, 81 N.C. App. 369, 344

S.E.2d 357 *disc. rev. denied*, 318 N.C. 417, 349 S.E.2d 600 (1986) (for a taking to occur, the restriction must deprive property owner of virtually all beneficial uses of land); *Beverages, Inc. v. City of New Bern*, 6 N.C. App. 632, 171 S.E.2d 4, *cert. denied*, 276 N.C. 183 (1970) (commercial lot and industrial building rezoned from business-commercial to residential and office-institutional; to determine if a taking has occurred, inquiry is whether property as rezoned has some positive value).

[3] The property owner's actual investment in the property prior to a rezoning is not determinative of "practical use" and "reasonable value" of the property after rezoning. A regulatory taking occurs if, in the words of Justice Holmes, the "regulation goes too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 67 L. Ed. 322, 326 (1922). The cases uniformly reject the proposition that a diminution in property value, even a severe one, necessarily goes too far. *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 131, 57 L. Ed. 2d 631, 652, *reh'g denied*, 439 U.S. 883, 58 L. Ed. 2d 198 (1978). *See generally Euclid v. Ambler Realty Co.*, 272 U.S. 365, 71 L. Ed. 303 (1926) (75% diminution in value caused by zoning law); *Hadacheck v. Sebastian*, 239 U.S. 394, 60 L. Ed. 348 (1915) (87.5% diminution in value); *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023 (3rd Cir.), *cert. denied*, 482 U.S. 906, 96 L. Ed. 2d 375, *reh'g denied*, 483 U.S. 1040, 97 L. Ed. 2d 800 (1987) (alleged 89.5% diminution caused by rezoning); *William C. Haas & Co. v. City and County of San Francisco*, 605 F.2d 1117 (9th Cir. 1979), *cert. denied*, 445 U.S. 928, 63 L. Ed. 2d 761, *reh'g denied*, 446 U.S. 929, 64 L. Ed. 2d 282 (1980) (95% diminution). "[L]oss of future profits — unaccompanied by any physical property restriction — provides a slender reed upon which to rest a takings claim. . . . [T]he interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." *Andrus v. Allard*, 444 U.S. 51, 66, 62 L. Ed. 2d 210, 223 (1979).

*Andrus* involved a claim for an alleged "taking" of personal property. Congress had banned all sales of eagles or eagle parts. The ban completely destroyed the market value of North American Indian relics incorporating eagle feathers, even though the artifacts came into existence prior to the statutory ban. The United States Supreme Court held that no taking occurred, since the artifact owners retained the right to possess, transport, devise and donate their property. *Id. Compare Hodel v. Irving*, 481 U.S. 704, 95 L. Ed. 2d 668 (1987) (taking occurred where statute deprived claimants of

rights of descent and devise). Though *Andrus* involved personal rather than real property, it serves to demonstrate that even a one hundred percent diminution in property value does not necessarily constitute a taking.

While our North Carolina cases speak in terms of "practical use" and "reasonable value" following the rezoning, many state court decisions hold that a regulatory taking occurs in the zoning context only if the government action deprives the owner of *all* value or use. *E.g., Landmark Land Co. v. City of Denver*, 728 P.2d 1281 (Colo. 1986), *appeal dismissed sub nom., Harsh Inv. Corp. v. City of Denver*, 483 U.S. 1001, 97 L. Ed. 2d 729 (1987) (no taking occurs unless land use regulation deprives owner of all value). *See* Wilkins, *The Takings Clause: A Modern Plot for an Old Constitutional Tale*, 64 Notre Dame L. Rev. 1, 32 n.222 (1989); *see also* 1 E. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 6.05[2] at 6-19, § 6.07 at 6-28 (1989).

[4] A taking does not occur simply because government action deprives an owner of previously available property rights. *Penn Central Transp. Co. v. New York*, 438 U.S. at 130, 57 L. Ed. 2d at 652 (citing *Goldblatt v. Town of Hempstead*, 369 U.S. 560, 8 L. Ed. 2d 130 (1962) (proscribing excavation below water table); *Gorieb v. Fox*, 274 U.S. 603, 71 L. Ed. 1228 (1927) (property setbacks not taking); *Welch v. Swasey*, 214 U.S. 91, 53 L. Ed. 923 (1909) (height limitation not taking)). "Government could hardly go on if to some extent values incident to property could not be diminished without paying for every change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. at 413, 67 L. Ed. at 325.

[5] The timing of the acquisition in respect to the regulatory action complained of is one relevant factor in an analysis of distinct investment-backed expectations. *Andrus*, 444 U.S. at 64 n.21, 62 L. Ed. 2d at 222 n.21. We have held that when a property owner makes expenditures in the absence of zoning or under the authority of a building permit, subsequent changes in the zoning of the property may not prohibit the resulting nonconforming use. *In re Campsites Unlimited, Inc.*, 287 N.C. 493, 215 S.E.2d 73 (1975); *Stowe v. Burke*, 255 N.C. 257, 122 S.E.2d 374 (1961). *See also A.A. Profiles, Inc. v. City of Ft. Lauderdale*, 850 F.2d 1483 (11th Cir. 1988), *cert. denied*, --- U.S. ---, 104 L. Ed. 2d 180 (1989). However, where an investor knows of a pending ordinance change proposed by a city planning board to the city council, the investor has no valid

claim that he relied upon the prior ordinance in guiding his investment decision. *In re Campsites Unlimited, Inc.*, 287 N.C. 493, 215 S.E.2d 73; *Stowe v. Burke*, 255 N.C. 257, 122 S.E.2d 374. An investor may speculate on regulatory changes, but "the purchase price is irrelevant to the reasonableness of the current restriction." 1 E. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 6.07 at 6-37 and n.40 (1989) (citing cases). To hold otherwise would constitute a windfall to the investor at taxpayer expense.

[6] In analyzing the distinct investment-backed expectations of plaintiffs, we note the City Council enacted the zoning change on 6 May 1985, seven days after plaintiffs were under an equitable obligation to perform the purchase contract. *Knott v. Cutler*, 224 N.C. 427, 31 S.E.2d 359 (1944). However, the undisputed evidence shows that plaintiffs chose to exercise their option to purchase the property on 29 April 1985. This was some twenty-seven days after plaintiffs knew of the recommendation by the Durham Planning and Zoning Commission to rezone the property to R-10. Plaintiffs' expectations of investment return were in fact based on a speculative risk that the Durham City Council would not rezone the property to prohibit the proposed Red Roof Inn project.

Plaintiffs argue that exercise of the option was necessary to protect prior financial investment in the property. It is axiomatic, however, that the purpose of an option contract is to minimize investment exposure to adverse changes in the business environment by postponing for an extended period the decision to accept or reject an offer. When such changes threatened, plaintiffs chose to ignore the warning clouds. They cannot now say that they reasonably expected an investment return untroubled by zoning changes. *See Stowe v. Burke*, 255 N.C. 257, 122 S.E.2d 374.

[7] Pursuant to the test set forth above in *Responsible Citizens v. City of Asheville*, 308 N.C. 255, 302 S.E.2d 204, we first examine the goals of the rezoning ordinance and determine whether a nexus exists between those goals and the rezoning ordinance itself. "A zoning ordinance will be declared invalid only where the record demonstrates that it has no foundation in reason and bears no substantial relation to the public health . . . or the public welfare . . . ." *Graham v. City of Raleigh*, 55 N.C. App. 107, 110, 284 S.E.2d 742, 744 (1981), *disc. rev. denied*, 305 N.C. 299, 290 S.E.2d 702 (1982) (citing *Euclid v. Ambler Realty Co.*, 272 U.S. at 395, 71 L. Ed. at 314). The burden of proof of establishing the invalidity

of a zoning ordinance is on the complaining party. *Schloss v. Jamison*, 262 N.C. 108, 136 S.E.2d 691 (1964).

The record reveals that the general goal of the rezoning ordinance is to protect an existing single-family residential neighborhood. Indeed, one of the goals of the City of Durham's comprehensive plan is to maintain the integrity of existing single-family residential neighborhoods. The Associate Director of Current Planning for the City testified that the planning staff considered that the O-I and C-1 zones should never have been placed to the south of I-85 because of the policy of preserving residential neighborhoods and that the development of plaintiffs' property and the Mobil tract as O-I and C-1 was a threat to the adjacent neighborhood. The City's Director of Planning and Community Development explained the nature of this threat — unless commercial and residential uses are separated by clear dividing lines such as highways or natural land features, a "domino effect" tends to occur in that commercial areas grow into strip areas which contribute to the degeneration of a residential neighborhood.

Plaintiffs offered no evidence to counter the City's evidence that a motel would have a commercializing impact on future land uses in the area south of I-85. Rather, one of plaintiffs' experts stated that further commercial development in the area would be desirable. Plaintiffs did offer evidence that the particular Red Roof Inn that they hoped to locate on the property would have limited lighting, sufficient for security purposes in the parking lot area, and would not serve truckers. There was also evidence that Red Roof Inn motels coexisted with residential neighborhoods in other cities. The City of Durham, however, cannot be expected to base zoning decisions on the promises of one potential developer. *See Blades v. City of Raleigh*, 280 N.C. 531, 187 S.E.2d 35 (1971); *Allred v. City of Raleigh*, 277 N.C. 530, 178 S.E.2d 432 (1970). Moreover, the O-I zoning would have permitted *any* hotel to develop on the property. *See Hall v. City of Durham*, 323 N.C. 293, 372 S.E.2d 564, *reh'g denied*, 323 N.C. 629, 374 S.E.2d 586 (1988). We conclude from this evidence that a sufficient nexus exists between the goals of the rezoning ordinance and the ordinance itself; the record here demonstrates that the ordinance has sufficient foundation in reason and bears a substantial relation to the public welfare. It therefore meets the first part of the *Responsible Citizens* test.

The second part of the test, "whether the means chosen to regulate was reasonable," requires an analysis of whether the rezon-

**FINCH v. CITY OF DURHAM**

[325 N.C. 352 (1989)]

ing ordinance deprives plaintiffs of all practical use of the property and renders it of no reasonable value. The burden is on plaintiffs to make such a showing. For the purposes of the City of Durham's motions for a directed verdict and judgment notwithstanding the verdict, plaintiffs' evidence must be accepted as true. *Williams v. Jones*, 322 N.C. 42, 366 S.E.2d 433, *reh'g denied*, 322 N.C. 486, 370 S.E.2d 237 (1988).

Both of plaintiffs' experts testified that the rezoning of plaintiffs' property from O-I to R-10 deprived plaintiffs of all practical, beneficial, and reasonable use of the property, though neither expert defined these terms. A review of the experts' testimony shows that their opinions were based partly on the likelihood that plaintiffs would not recapture their investment in the property. One of plaintiffs' experts qualified his opinion by noting that it was based in part on "financial consideration" and the notion that "too many other places" exist in Durham where one might invest one's money and "have an opportunity to come out better" now that the property was rezoned to R-10. The experts testified that in its undeveloped state the property was worth $20,000 to $25,000 after rezoning; that it could be used for one or two houses fronting on Hillandale Road; and that even though there were site constraints that might render the property less desirable for churches or day care centers, it could nevertheless be used for these purposes, and buyers could be found if the price were right.

The only potential use for the property that plaintiffs evaluated in some detail in their evidence was the possibility of fully developing it residentially, with two houses fronting on Hillandale Road and six houses on the back portion of the property. One of plaintiffs' experts concluded that if a road were built to allow access to houses on the back portion of the property, the road and associated utilities would cost more than the extra value created by the new lots there. He testified that with use permits granted by the Durham City Board of Adjustment, a maximum of six lots could be created at a value of $13,500 for each lot for a total of $81,000. Since the road and associated utilities would cost $121,000, plaintiffs would sustain a loss. Although this evidence appears to show that fully developing the property for residential purposes as lots for single-family residences would not be economically viable, it does not go far enough. There are seven other landlocked lots across from plaintiffs' property on the unopened Chesterfield Street which would be benefited by this road. Plaintiffs presented no evidence that

the owners of these lots were approached with a view to negotiating a possible sharing of the cost of road construction. Plaintiffs failed, therefore, to carry their burden of proving that residential development of the back portion of their property is not economically viable.

In addition, and more importantly under the particular facts of this case, plaintiffs presented no evidence of the submission of a proposed development plan in an attempt to have the property rezoned for more dense residential use or other use. This is particularly pertinent in view of the fact that the advisory report of the Planning and Zoning Commission recommended to the City Council that the property in question be rezoned for two "intermediate" uses—limited office institutional (O-I-L) and medium-density clustered residential development—either of which, upon approval of a site plan for development, would allow more intense use of the property. Indeed, the City's Associate Director of Current Planning testified that the "ideal" zoning for the property would be an intermediate use such as clustered residential.

Furthermore, although both of plaintiffs' experts gave as their ultimate opinion that the rezoning had deprived plaintiffs of all practical, beneficial, and reasonable use of the property, their testimony was in fact equivocal. One expert testified on cross-examination that the property's value for a church would be between $100,000 and $200,000. Churches did not require a use permit until 1987. The other expert testified that he had known a church to pay a top price of $20,000 per acre of land, and that although most churches prefer a parcel of three acres, if the price of plaintiffs' 2.6-acre property were adjusted, a church might find it attractive. Finally, plaintiff Vernon Finch himself testified that twenty-five to thirty persons had contacted him after he erected the "for sale" sign on the property. A price of between $100,000 and $150,000 was discussed with regard to locating a child care facility on the property. This evidence signally fails to support the notion that plaintiffs' property had no practical use or reasonable value.

Our review of the testimony and other documents in the record demonstrates that the real gravamen of plaintiffs' claim is that the available uses and value of their property under the R-10 zoning are not comparable to its value for motel use under O-I, in either market appeal or market price. The argument that a use that does not guarantee a return on investment is thus neither practical nor reasonable fails in the face of the principle that the fact that

a rezoning ordinance results in some substantial depreciation of the value of plaintiffs' property or restricts their right to some degree to develop it as they wish is insufficient to render the ordinance invalid. *Responsible Citizens*, 308 N.C. 255, 265, 302 S.E.2d 204, 210.

Interpreted in the light most favorable to plaintiffs, the evidence shows that the public purpose of protecting an existing residential neighborhood from commercial encroachment is substantially advanced by the ordinance rezoning plaintiffs' property from O-I to R-10. As rezoned to R-10, the property could be used for single-family houses, athletic fields, cemeteries, mausoleums, child care centers, churches, clubs or private lodges, noncommercial community buildings, family care homes, parking lots, public buildings, libraries, museums, art galleries, parks, recreational facilities, public or private swimming pools, and schools, including nursery schools and kindergartens. Plaintiffs' own evidence shows that several uses permitted under R-10 zoning could be made of the property, such as residential, day care, or church use. Even though the market for these uses would not be strong, certain of these uses could command a substantial sales price for the property. Finally, plaintiffs' evidence showed that the property could have been sold undeveloped for between $20,000 and $25,000 at the time of trial. We conclude that the property as rezoned retains both practical use and reasonable value and therefore meets the second part of the *Responsible Citizens* test.

Recognizing that a motion for judgment notwithstanding the verdict must be cautiously and sparingly granted, *Investment Properties v. Allen*, 281 N.C. 174, 188 S.E.2d 441 (1972), *rev'd on other grounds*, 283 N.C. 277, 196 S.E.2d 262 (1973), and that the trial court may grant such a motion only if the evidence is insufficient as a matter of law to justify a verdict for the nonmovant, *Williams v. Jones*, 322 N.C. 42, 366 S.E.2d 433, we hold that the rezoning of plaintiffs' property from O-I (office-institutional) to R-10 (residential) does not amount to a taking of that property under our state Constitution. Assuming, *arguendo*, that the taking claim under the United States Constitution is ripe for decision by this Court, we further hold, for the same reasons discussed above, that the rezoning of plaintiffs' property does not amount to a taking under the United States Constitution.

Since the rezoning of plaintiffs' property does not amount to a taking under the North Carolina Constitution or the United States

FINCH v. CITY OF DURHAM

[325 N.C. 352 (1989)]

Constitution, the trial court erred in failing to grant the City of Durham's motions for a directed verdict and judgment notwithstanding the verdict on plaintiffs' state and federal constitutional taking claims. In view of our disposition of the case on this ground, we need not address the challenge to the adequacy of plaintiffs' evidence as to damages.[1]

This disposition requires consideration of two issues presented in plaintiffs' cross-appeal:

[8] First, plaintiffs argue that the trial court erred in granting defendant's motion for summary judgment on their 42 U.S.C. § 1983 claim of a taking. We disagree. Plaintiffs' forecast of evidence was insufficient to submit the issue of a taking to the jury. Our holding is buttressed by our conclusion that plaintiffs' evidence at trial was insufficient to sustain a taking claim.

[9] Second, plaintiffs argue that the trial court erred in failing to conclude that defendant acted arbitrarily, capriciously and unreasonably in removing plaintiffs' property from the O-I zone in 1985. It is settled law that landowners are not guaranteed that existing zones will remain unaltered. Zoning regulations "may be amended or changed when the action is authorized by the enabling statute and does not contravene constitutional limitations on the zoning power. Constitutional limitations, however, forbid arbitrary and unduly discriminatory interference with property rights in the exercise of such power." *Allgood v. Town of Tarboro*, 281 N.C. 430, 439, 189 S.E.2d 255, 261 (1972) (citations omitted).

The evidence here establishes that until 1979 plaintiffs' land had been in a residential zone, and that during the period between the 1979 and 1985 rezonings, plaintiffs' land and the adjacent Mobil tract comprised a virtual island of commercially or institutionally

---

1. The trial judge assumed that the measure of damages was the value of the property immediately prior to the adoption of the rezoning ordinance, less the value of the property immediately after the adoption of the rezoning ordinance, multiplied by the market rate of return and the length of time of the taking in years. While there is authority for this method of computing damages in such a case as this, *see Wheeler v. City of Pleasant Grove*, 833 F.2d 267 (11th Cir. 1987), it is by no means the only method available, and this Court has not spoken to the issue in a zoning case. Methods other than the rate of return method which are available and have been employed by other courts include the rental value, option value, actual or out-of-pocket losses, and others. *See* 4 E. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 46.03[2][d] at 46-60 (1989) ("Calculating Damages").

zoned land in a large and stable residential area on the south side of Interstate 85. Residentially zoned land used for homes, a church, and a day care center bordered the rezoned area on three sides. South of I-85, no other Watts-Hillandale area property in close proximity to the *locus in quo* was zoned for commercial or office-institutional use. The nearest property south of I-85 zoned for such use was some distance to the east on Guess Road. Property to the north was zoned similarly, but was separated from the tract in question by an interstate highway. Defendant's Associate Director of Current Planning testified that in the planning staff's view the commercial and institutional zones should not have been placed south of I-85 because of defendant's policy of preserving residential neighborhoods.

The foregoing shows that the initial 1979 rezoning of plaintiffs' property from R-10 to O-I removed the property from residential zoning, made it a virtual island of commercially or institutionally zoned land in a large and stable residential area, and contravened defendant's policy of preserving residential neighborhoods. Defendant's 1985 action to return the property to its prior zone in conformity with the remainder of the neighborhood, thus returning the property to conformity with defendant's policy of preserving residential neighborhoods, was not so arbitrary, capricious or unreasonable as to require its invalidation on that basis. Plaintiffs had neither obtained a building permit, *Stowe v. Burke*, 255 N.C. 527, 122 S.E.2d 374, nor begun actual construction in good faith reliance on the existing zone, *In re Campsites Unlimited*, 287 N.C. 493, 215 S.E.2d 73. Plaintiffs therefore had acquired no vested right to go forward with the proposed motel development. In view of the preliminary stage of the proposed development and the timing of plaintiffs' acquisition of the property, the action was not so arbitrary, capricious or unreasonable, as applied to them, as to require its invalidation on that basis.

> When the most that can be said against [zoning] ordinances is that whether it was an unreasonable, arbitrary or unequal exercise of power is fairly debatable, the courts will not interfere. In such circumstances the settled rule seems to be that the court will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining whether its action is in the interest of the public health, safety, morals, or general welfare.

*In Re Appeal of Parker*, 214 N.C. 51, 55, 197 S.E. 706, 709 (1938).

**FINCH v. CITY OF DURHAM**

[325 N.C. 352 (1989)]

The judgment of the trial court is reversed, and the case is remanded to the Superior Court of Durham County for entry of judgment consistent with this opinion.

Reversed and remanded.

Justice MARTIN concurring.

I agree and concur with the well-reasoned majority opinion and write only to state additional reasons in support of the Court's decision.

Plaintiffs bought the subject property *after* it had been rezoned R-10. As they did not own the property at the time it was rezoned, they were not damaged by the zoning. Plaintiffs contend, however, that they were legally obligated to purchase the property after they notified the owner of the land that they intended to exercise their option. This occurred on 29 April 1985, three days after plaintiffs' agreement with Red Roof Inns expired and twenty-seven days after plaintiffs knew of the recommendation of the Durham Planning and Zoning Commission to rezone the property to R-10. On 6 May 1985, the Durham City Council so rezoned the property. It was not until 26 June 1985 that plaintiffs acquired title to the subject property then zoned R-10.

It is true that upon acceptance of an option to purchase the option becomes a binding contract to purchase the property. However, such contract is not subject to specific performance unless it is otherwise a proper subject for equitable relief. *Kidd v. Early*, 289 N.C. 343, 40 S.E.2d 367 (1976). Whether specific performance will be granted is determined on a case by case basis according to the equities as disclosed by a just consideration of all the circumstances of the particular case. *Byrd v. Freeman*, 252 N.C. 724, 114 S.E.2d 715 (1960).[1]

---

1. Contrary to the dissent of Chief Justice Exum, I do not concede that plaintiffs were obligated by contract to purchase the property at the time it was rezoned. As set forth in this concurring opinion, the contract could not be specifically enforced against plaintiffs. Nor do I agree with the dissenter that plaintiffs were the "beneficial" owners of the property at the time of the rezoning. A beneficial owner of real property is either an owner entitled to the rents and profits or usufruct of the property, or the cestui que trust wherein the property is the trust corpus. Persons for whom a trustee holds title to property are the beneficial owners of property. Black's Law Dictionary 142 (rev. 5th ed. 1979). Such is not the status of an optionee.

When the subject matter of an executory contract is destroyed without fault of the party seeking to be excused from performance, impossibility of performance is recognized in this jurisdiction as grounds for rescission. *Brenner v. School House, Ltd.*, 302 N.C. 207, 274 S.E.2d 206 (1980); *Sechrest v. Forest Furniture Co.*, 246 N.C. 216, 141 S.E.2d 292 (1965); *Sale v. Highway Comm.*, 242 N.C. 612, 89 S.E.2d 290 (1955).

In Black on Rescission and Cancellation, sec. 213, it is stated: "The true rule appears to be that rescission or cancellation may properly be ordered where that which was undertaken to be performed in the future was so essential a part of the bargain that the failure of it must be considered as destroying or vitiating the entire consideration of the contract, or so indispensable a part of what the parties intended that the contract would not have been made with that condition omitted."

*Jenkins v. Myers*, 209 N.C. 312, 318, 183 S.E. 529, 533 (1936).

Obviously, it would not have been equitable to require plaintiffs to purchase this property when all the parties intended to buy and sell the property for use as a motel. This intent of the parties was set forth in both of the contracts between the parties. At the time of the sale, the property could not be used for the intended purpose.

This situation is analogous to the cases denying specific performance when the loss of the intended use of the property by fire occurs before the contract of sale is consummated. *See Sale v. Highway Comm.*, 242 N.C. 612, 89 S.E.2d 290 (1955); *Poole v. Scott*, 228 N.C. 464, 46 S.E.2d 145 (1948). In the case at bar, utilization of the property as a motel site was the principal and most material and substantial inducement for plaintiffs to enter into the contract to purchase the subject property. That use was destroyed before the contract was executed. Here, plaintiffs would not be equitably required to purchase the property.

However, knowing all this, plaintiffs proceeded to buy the property, being fully aware that it could not be used for motel purposes. Plaintiffs' contract with Red Roof Inns had *required* that the property be zoned for use as a motel. Plaintiffs exercised their option under the written contracts of the parties for the purchase and sale of a tract of land zoned for use as a motel; however,

FINCH v. CITY OF DURHAM

[325 N.C. 352 (1989)]

they accepted instead a tract of land zoned for residential purposes and not usable as a motel. If plaintiffs had an equitable interest, it was in the tract of land usable for motel purposes as demonstrated in the written contracts of the parties. In this transaction, plaintiffs did not acquire such a tract. They suffered no compensable damages by reason of the rezoning.

Further, plaintiffs failed to offer any evidence of damages under the applicable rule for damages in this case. Here, the proper relief for a successful plaintiff is to have the ordinance declared unconstitutional as applied to the subject property together with damages for the temporary taking of the property by the city during the time that the property was unconstitutionally subjected to the ordinance.

The evidence in this case as to the value of the property before and after it was rezoned for residential use was competent only to prove that the ordinance was unconstitutional as applied to the subject property. It was not competent to prove the damages resulting from the temporary taking of the property. This is true because the plaintiffs did not lose, nor did the city acquire, title to the property as a result of the rezoning.

Where property is taken as the result of governmental action for a temporary period of time, rather than permanently, the measure of compensation is not the fair market value of the property, but what the property is fairly worth during the time for which it is held or encumbered: in other words, the fair rental value of the property for the period it was held or encumbered. 27 Am. Jur. 2d *Eminent Domain* § 351 (1966); 29A C.J.S. *Eminent Domain* § 142 (1965); *see* 7 A.L.R. 2d 1299 (1949).

Plaintiffs failed to produce any evidence of damages under the appropriate rule for the measurement of damages in this case. Having failed to do so, plaintiffs' action for damages was subject to dismissal.

Chief Justice EXUM dissenting.

First I think it important to set out the procedural posture in which this case reaches the Court. Plaintiffs filed this action in November 1985 for a declaratory judgment that Durham's ordinance rezoning the property in question from office institutional (O-I) to residential (R-10) was invalid because, among other reasons,

it was an unconstitutional taking without just compensation under the state and federal constitutions. Only plaintiffs' taking claims proceeded to trial. The jury was instructed by Judge Bowen in pertinent part as follows:

> The enactment of zoning ordinances is not a contract with the property owners of the City and confers upon them no vested rights to have the ordinances remain forever in force, or to demand that the boundaries of each zone or the uses to be made of the property in each zone remain as declared in the original ordinance. Such legislation may be repealed in its entirety or amended as the City's legislative body determines from time to time to be in the best interest of the public subject only to the limitations of the statutes and the limitations of the Constitution of North Carolina, and the Constitution of the United States.

> The City Council may lawfully and without payment to the landowners regulate land and thereby reduce the value of land.

> The mere fact that an ordinance resulted in depreciation of the value of individual property or restricts to a certain degree the right to develop it as he deems appropriate is not sufficient reason to render the ordinance invalid.

> A rezoning or a regulation constitutes a taking of the landowner's property and requires that the City pay just compensation to the landowner when the landowner is deprived of all practical uses of the property and the property is rendered of no reasonable value.

> . . . .

> Members of the Jury, both the North Carolina Constitution and the United States Constitution prohibits a governmental taking of property without just compensation.

> The R-10 zoning ordinance imposed by the City on the plaintiffs' property is invalid and therefore, void if it constitutes a taking of the plaintiffs' property.

> The R-10 ordinance is an invalid exercise of police power and void at the taking if the plaintiffs were deprived of all reasonable, beneficial or practical use of their property, con-

sidering the economic and physical feasibility of the use of the property as R-10.

In considering this issue you may from all of the evidence examine the uses to which the plaintiffs' property can be economically and practically put under the R-10 zoning classification.

So, Members of the Jury, if you find by the greater weight of the evidence that the plaintiffs were deprived of all reasonable, beneficial or practical use of the property, considering the economic and physical feasibility of the use of the property as R-10, then you should answer this issue, yes, that is, finding that the R-10 zoning is invalid.

If you fail to so find, then you should answer this issue, no.

The jury found there was a taking but found plaintiffs had suffered no damages.

Insofar as the jury found a taking, Judge Bowen entered judgment on the verdict and declared the ordinance invalid.[1] He then allowed plaintiffs' motion for judgment notwithstanding the verdict on the damages issue and awarded damages for a temporary taking of $150,937.50.[2] He also allowed plaintiffs' motion for costs of $600 and attorney's fees of $61,598.61.

---

1. The remedy for a zoning ordinance which amounts to an unconstitutional taking is to declare the ordinance void insofar as it applies to the property taken. See *Helms v. Charlotte*, 255 N.C. 647, 653, 122 S.E.2d 817, 822 (1961), citing McQuillin on Municipal Corporations.

2. Damages based on a temporary taking were calculated as follows: value of the property immediately prior to the taking ($550,000), less the value of the property immediately after the taking ($25,000), multiplied by the market rate of return (10%), and by the length of time of the taking in years (from 6 May 1985 through 18 March 1988).

I believe (and there seems to be no dispute between the parties on this point) that, assuming there has been a temporary unconstitutional taking, *i.e.*, from the time of the ordinance's enactment to the time it was declared void, damages are properly allowed for it. The trial court instructed the jury to calculate these damages essentially as it did when determining them itself. It also instructed the jury that the damages thus derived "should be adjusted by any appreciation of the land that has occurred during the time the R-10 zone was in effect." Considering the post-verdict motions, the trial court presumably thought this "appreciation" instruction was responsible for the jury's not awarding any damages for a temporary taking and was error. It, therefore, awarded plaintiff's motion for judgment notwithstanding the verdict on the damages issue and proceeded to calculate these

**FINCH v. CITY OF DURHAM**

[325 N.C. 352 (1989)]

In an apparent effort to guard against an appellate court holding that the taking question should be decided by the court and not a jury (as defendant contended) Judge Bowen noted in his judgment that "if the issue of a 'taking' had been tried by this Court, without a jury, this Court would have entered findings of fact and conclusions of law in accordance with the jury and as shown on judgment attached hereto as 'Exhibit A.' " The alternative judgment attached as Exhibit A included the following pertinent findings:

28. The R-10 zoning classification in the City of Durham permits the Property to be used for a single-family residence, child care facility, church, community building, government building, family care home, school, swimming pool and other miscellaneous uses.

29. Under the present R-10 zoning classification, the Property may only be used for the construction of one single-family residence due to its shape, access and width of lots without obtaining a use permit and a use of the Property as a child care facility, church, community building, government building, school, swimming pool, family care home (limited to 5 persons) or other miscellaneous uses, requires the issuance of a special use permit by the Board of Adjustment of the City of Durham.

30. If the Property were developed for residential purposes and subdivided into more than one lot, upon completion of curb, gutter and other city required improvements, the market value of the houses and lots would be less than the cost of constructing the houses with requisite streets and utilities.

31. There is no market for the sale of the Property for residential purposes or other permitted uses under the R-10

---

damages itself, without any adjustment for appreciation, based on the plaintiff's evidence.

Without intending to express a firm opinion, I doubt that the trial court had authority to enter judgment notwithstanding the verdict in favor of plaintiffs on the damages issue. This is tantamount to a directed verdict in favor of the party with the burden of proof on an issue in the case on which the evidence was in sharp conflict. The better course would have been for the trial court simply to set aside the verdict on the damages issue as being against the greater weight of the evidence or because, as may have been the case here, the court thought it had committed error in its instructions on this issue. The court could then order a new trial in which the jury, on proper instructions, could assess the damages based on how it viewed the evidence.

zoning classification and the Property has no reasonable value for the permitted uses.

32. The downzoning of the Property rendered the development of the Property for the permitted uses under the R-10 zoning classification impractical and unsuitable.

33. The downzoning of the Property deprived the Plaintiffs of the beneficial use of the Property by precluding all practical uses and the only use to which it is reasonably adopted.

34. The City of Durham, by downzoning the Property, deprived the Plaintiffs of all practical, reasonable, and beneficial use of the Property and rendered the Property valueless.

35. The City of Durham, by downzoning the Property, deprived the Plaintiffs of all economically viable use of the Property and the Plaintiffs have lost their investment backed expectations.

First, I believe Judge Bowen correctly submitted the taking issue to the jury. The evidence on this issue was in conflict. Plaintiffs' evidence tended to support a taking and defendant's evidence tended to the contrary. It was for the jury to resolve the conflict and determine the issue under correct instructions. See *Helms v. Charlotte*, 255 N.C. 647, 657, 122 S.E.2d 817, 825 (1961) (jury trial waived and taking issue submitted to judge by agreement). I believe it did so, and I vote to affirm Judge Bowen's judgment entered on the verdict as to the taking issue.

I have no quarrel with the majority's exposition of the proper legal standard to be used in determining whether a zoning ordinance constitutes an unconstitutional taking of property without due process. My disagreement is with the majority's application of that standard to the evidence in this case.

The standard, as the jury was here instructed, is whether the zoning deprives owners (actual, or as here, beneficial) of all practical uses of their property so that it has no reasonable value. *Responsible Citizens v. City of Asheville*, 308 N.C. 255, 263-64, 302 S.E.2d 204, 209-10 (1983); *Helms v. Charlotte*, 255 N.C. at 653, 122 S.E.2d at 822. The standard is essentially the same under the state and federal constitutions. Compare *Citizens* and *Helms* with *Agins v. Tiburon*, 447 U.S. 255, 260-61, 65 L.Ed.2d 106, 112 (1980), and *Penn Central Transp. Co. v. New York City*, 438 U.S.

104, 123-28, 57 L.Ed.2d 631, 647-51, *reh'g denied*, 439 U.S. 883, 58 L.Ed.2d 198 (1978). The standard does not require that the zoning prohibit all possible uses or that it render the property absolutely valueless. The key words in the standard are "reasonable" and "practical." In *Helms* the Court remanded the taking issue for further findings and conclusions because:

> The findings of fact and conclusions of law with respect to the indicated question do not support the judgment on this issue. The court found that a residence could be built, but it did not find that it would be practical, desirable and of reasonable value. In short, the court did not find that the lot had any reasonable value for residential use and that such use was practical.

*Helms v. Charlotte*, 255 N.C. at 657, 122 S.E.2d at 825.

The controlling issue before us is whether there is evidence in the case which, when viewed in the light most favorable to plaintiffs and when all conflicts, contradictions, and inconsistencies in the evidence are resolved in plaintiff's favor, is sufficient to support the jury's determination that the rezoning deprived plaintiffs of all practical use of their property so that it had no reasonable value. *See Williams v. Jones*, 322 N.C. 42, 47-48, 366 S.E.2d 433, 436, *reh'g denied*, 322 N.C. 486, 370 S.E.2d 237 (1988).

I am confident there is such evidence. Much of it is summarized in the majority opinion. As the majority notes, both of plaintiffs' real estate experts testified ultimately that the rezoning had deprived plaintiffs of all reasonable, practical, and beneficial use of their property. These opinions were based on the experts' thorough familiarity with and their careful and well-documented study of the property. The experts did not overlook, but had carefully considered and were duly examined about, many of the uses of the property permitted by R-10 zoning.

The majority attempts to discredit this evidence. The majority states plaintiffs' experts' testimony was "in fact equivocal" and "[a] review of the experts' testimony shows their opinions seem to be based partly on the likelihood that plaintiffs would not recapture their investment in the property." The majority also states "that the only potential use for the property that plaintiffs evaluated in some detail in their evidence was the possibility of fully developing [the property] residentially" and "plaintiffs presented no evidence

of the submission of a proposed development plan in an attempt to have the property rezoned for more dense residential use or other use." The majority suggests the experts' testimony supports its conclusion that the property has "both practical use and reasonable value" because it "shows that several uses permitted under R-10 zoning could be made of the property" and "that the property could have been sold undeveloped for between $20,000 and $25,000 at the time of trial."

A careful review of the testimony makes plain, in my view, that the experts' opinions were not equivocal and were based not on whether plaintiffs could recapture their investment in the property, but rather on a thorough evaluation of the property as rezoned. In addition, their testimony cannot be fairly characterized as detailed only with respect to an evaluation of developing the property residentially; rather their evaluations included analyses of the feasibility and practicality of a number of potential R-10 uses including development as a church or a day care center. Both experts' evaluations of the site were based on topographic, environmental, and market considerations. While, as the majority correctly notes, plaintiffs' experts did testify that several uses permitted under R-10 zoning could possibly be made of the property, they both testified that none of these possible uses were reasonable, practical, or beneficial because there was very little, if any, market for these uses. This testimony was corroborated by defendant's witness Hay, who admitted on cross-examination that it could take "six months to a year" or even longer to find a purchaser for this property as zoned R-10. Witness Ward testified that he had "not seen any evidence on any information that has been produced that would indicate that the City Council would vote to change this zone to anything else" other than R-10, thereby demonstrating that any attempt to have the property rezoned for a more dense residential use would be fruitless. Moreover, an unsuccessful petition to rezone should not be a prerequisite to plaintiffs' challenge to the present zoning ordinance as an unconstitutional taking.[3]

---

3. A rezoning application prerequisite to a taking claim fails to take into account the nature of these claims and the remedies available. As to the landowner's primary remedy, the prerequisite is illusory and provides ultimately no real, additional protection for the zoning authorities. This is so because if the landowner succeeds in establishing a taking by the challenged zoning classification, the ordinance will simply be voided insofar as it applies to the landowner's property. At that point the zoning authorities must consider other possible zoning classifications. I believe zoning authorities would prefer to have their zoning classifications

Finally, both of plaintiffs' experts testified that the value of the property immediately before the rezoning was $550,000. Witness Cochran valued the property after the rezoning as an undevelopable tract at $20,000; and witness Ward, at $25,000.

Mr. Ralph Cochran, President of Allenton Development, Inc., testified that he was thoroughly familiar with the property in question, situated at the intersection of Interstate 85 and a busy, four-lane intercity connector known as Hillandale Road. Mr. Cochran was familiar with the property both before and after it was rezoned from O-I to R-10. He testified that in order to develop the property for single-family residential purposes, the only permitted use at time of trial not requiring a use permit to be issued by the Board of Adjustment, the owner would have to install a 32-foot wide street with curbing and asphalt paving and an eight-inch municipal sewer line with a fire hydrant as prescribed by municipal regulations. Installation of the street and sewer lines would permit as many as eight single-family residence building lots, provided the Board of Adjustment permitted size variances on two of the lots which would be slightly undersized. The cost of the improvements in Mr. Cochran's opinion would be approximately $121,500 after which the eight lots could be sold for an average price of $13,500. The result is that the property would have a negative value for development for single-family residential purposes. Without the street and sewer improvements the land would accommodate only one single-family residence lot.

Mr. Cochran testified that he also gave consideration to all other uses under R-10 zoning which required the issuance of a use permit by the Board of Adjustment. He said that while the site "physically would fit a church," there would be no market for the property for church use because churches "have to go where the people are . . . . [T]hey are going to the suburbs where the residential developments are going, where the young people are . . . ." Mr. Cochran testified that he had dealt professionally with approximately a dozen churches in an effort to locate sites for

---

remain in effect until it has been judicially determined that they are invalid, rather than respond, short of such a determination, to an application for a change which they have already, by implication if not expressly, rejected. For a secondary remedy the landowner may also be entitled to damages for any temporary taking of his property during the time an invalid zoning classification remained in effect. A rezoning application prerequisite to a taking claim eliminates altogether this secondary remedy.

them. No church had ever chosen to locate on the quadrant of any intersection on Interstate 85, the Durham East-West Expressway or Interstate 40. In his opinion there would be "a very slim margin out there of buyers" for church purposes. Mr. Cochran testified that assuming the Board of Adjustment would issue a use permit for a day care center, nursery, preschool kindergarten, or retirement home, the property would be topographically suitable for such functions but there would be little if any market for a child care facility because of the heavy traffic and noise level and because people desire to locate them in the suburbs. He said the construction of private clubs in the Durham area in the last twenty years had been on the downswing and most private organizations were looking for land out in the county rather than in Durham.

Ultimately Mr. Cochran testified that based on his twelve years' experience in the Durham real estate market and his familiarity with the development of R-10 property in Durham, the subject property was "just not suitable for that kind of development." In his opinion the zoning change from O-I to R-10 deprived the plaintiffs "of the beneficial use of the property." He valued the property zoned O-I at $520,000 as developable land and, zoned R-10, at $20,000 as undevelopable land. On cross-examination Mr. Cochran did not retreat from any of the opinions he offered on direct. Regarding the property's use as a church, the following question and answer did occur on cross-examination:

Q. This property for use for a church would also have a value in excess of One Hundred Thousand and in excess of Two Hundred Thousand, wouldn't it, sir?

A. I think that's probably true. I don't have specific numbers on what churches are paid these days.

Earlier, however, during cross-examination, Mr. Cochran made it clear that there was little if any market for the property as a church because, "my opinion is that most churches that are buying sites today are buying those sites in the suburbs and not in the maturing neighborhoods."

On redirect examination Mr. Cochran testified that, under R-10 zoning, the property could not legally be developed for many of the uses he was asked about on cross-examination. He said it could not be developed for apartments, offices, or condominiums.

Mr. Frank Ward, President of Frank Ward Realty and Insurance Company, testified that he had had many years' experience in appraising, listing, selling and developing properties, advising and counseling people in the real estate business in Durham and around Durham. He was thoroughly familiar with the evolution of the subject property over the last thirty years, including the construction of Interstate 85 and the enlarging of Hillandale Road to a major, four-lane intercity connector and north-south artery. He recalled the first commercial development in the Hillandale I-85 quadrant to be a service station in the northwest corner. In the late 1960s or early 1970s, before the enlargement of Highway 70 to Interstate 85 and before Hillandale Road became a major four-lane artery, St. Luke's Episcopal Church was built at or near the intersection. Since the upgrading of Highway 70 to Interstate 85 and the enlarging of Hillandale Road, however, all of the development in and around this quadrant had been exclusively commercial. The traffic is such at this intersection, according to Mr. Ward, that to go through the intersection on Hillandale Road and negotiate all the traffic signals requires two to three minutes.

In Mr. Ward's opinion the property is too small for use as a church. Regarding the R-10 zoning of the property, Mr. Ward testified, "My opinion is from the point of practicality and financial consideration it is not a practical use for the piece of property." Mr. Ward further stated that in his opinion the plaintiffs have been deprived of "all reasonable, practical and beneficial use" of the property. He said "from practical financial consideration . . . to try . . . to use the property for single-family use would be foolhearted, and I think showing very poor judgment on the part of someone." In Mr. Ward's opinion the property zoned O-I had a value of $550,000 as developable land and, zoned R-10, $25,000 as undevelopable, vacant land.

Mr. Ward testified that he considered all other permitted uses in an R-10 zone "and I ended up rejecting these optional uses because of supply and demand situations that I've seen in the market place and because of competitive situations that I think exist in most of these situations where people have to make decisions about them." He testified, "As a practical matter I do not see it as a church location and I would not suggest to a church that they locate there . . . unless the consideration was the best that I could get for my money or I could do much better there for my money than I can do some other place." As for day care

centers Mr. Ward said, "They want to be in a location where they will be the most successful . . ., where they will have the greatest appeal, the greatest convenience to their customers, and I do not think this is that kind of location. . . . [T]he traffic in and out of there . . . would be horrendous. . . ." In Mr. Ward's opinion there was no practical use for the property for any type of child care institution; and there was no demand for the property for use as a community center, club or fraternal organization.

In Mr. Ward's opinion the property, zoned R-10, would be worth $25,000 "for speculative investment" only. Mr. Ward said, "Most property zoned R-10 is not on the quadrant of an interstate highway and most of it is zoned and sold for residential purposes." He said that in the last ten to fifteen-year period he could not recall the development of any property for any of the permitted uses within an R-10 zone on any quadrant of the various Durham street intersections with Interstate 85, the East-West Expressway, or Interstate 40.

Again, Mr. Ward did not retreat on cross-examination from any of the opinions he firmly expressed on direct.

Accepting plaintiffs' evidence as true and viewing it in the light most favorable to plaintiffs, as the majority concedes is required, I conclude there was sufficient evidence from which the jury could find that the rezoning had deprived plaintiffs all *practical* use of the property so that it had no *reasonable* value.

There can be cases in which the evidence is so one-sided that rezoned property can be said as a matter of law to have or not to have "practical use" and "reasonable value." This is not such a case. Here the evidence is conflicting, and even the plaintiffs' evidence considered alone would not be enough to conclude as a matter of law that a taking occurred. Rather it is for the jury first to decide what evidence it finds credible and second to apply the legal standard as given it by the trial court to that evidence to determine whether a taking has occurred. Plaintiffs' evidence, if believed, is enough for a jury to conclude under the standard that a taking occurred.

If plaintiffs' evidence is believed, the rezoned property is analogous to an automobile which has been completely destroyed, "totaled" in the vernacular, in a collision. Although the automobile has some value as junk, its owner has been deprived of all practical

use of the automobile so that it has no reasonable value as an automobile. Similarly, here plaintiffs' evidence tended to show that after rezoning the property had only minimal, residual value as undevelopable land. The rezoning deprived plaintiffs of all practical use of their property so that its minimal, residual value as undevelopable land was simply no longer reasonable. At least the evidence was such that a jury could so find.

I also disagree with the position taken by Justice Martin in his concurring opinion. First, the City of Durham does not rely on the fact that the contract between plaintiffs and the owners for the sale of the property had not been closed and title transferred at the time of rezoning. This point was neither briefed nor argued before us, except in response to questions directed to counsel by Justice Martin.

Second, at the time of rezoning plaintiffs were under a contractual obligation to purchase the property at the agreed-upon price. I am confident that the sellers of the property would have been entitled to specific performance of the contract at the agreed price had plaintiffs refused to comply with the contract.

> As to when specific performance [of a contract for conveyance of land] will be enforced in this jurisdiction the rule is clearly stated in *Combes v. Adams*, where *Hoke, J.*, speaking for the Court, said: 'It is accepted doctrine that a binding contract to convey land, when there has been no fraud or mistake or undue influence or oppression, will be specifically enforced. . . . [M]ere inadequacy of price, without more, will not as a rule interrupt or prevent the application of the principle.'

*Knott v. Cutler*, 224 N.C. 427, 432, 31 S.E.2d 359, 361 (1944) (citations omitted). I can find no reported case in this jurisdiction where specific performance of a contract for the sale of land, at least in the absence of fraud, mistake, undue influence or the equivalent, has not been awarded against the nonperforming party. *See, e.g.,* *Texaco v. Creel*, 310 N.C. 695, 314 S.E.2d 506 (1984) (specific performance approved despite rather severe "inequities" to seller). While *Byrd v. Freeman*, 252 N.C. 724, 114 S.E.2d 715 (1960), relied upon by Justice Martin, does quote broader language from *American Jurisprudence*, the Court there affirmed a decree of specific performance awarded by the trial court.

.

In conclusion and for the reasons stated I would vote to affirm the trial court's entry of judgment on the verdict as to the taking issue. My inclination, for the reasons set out above in footnote 2., would be to vacate the trial court's allowance of plaintiffs' motion for judgment notwithstanding the verdict on the damages issue and remand this issue for a jury trial.

Justices FRYE and WEBB concur in this dissenting opinion.

Justice FRYE dissenting.

I concur in the Chief Justice's dissenting opinion. The ultimate question before the Court in this case is whether the plaintiffs carried their burden of showing that the rezoning of plaintiffs' property amounted to a taking under either the North Carolina Constitution or the United States Constitution. The jury found that a taking had occurred. After making findings of fact, the trial court also concluded that a taking had occurred. The majority of the Court now holds that the City of Durham's motions for a directed verdict and judgment notwithstanding the verdict should have been granted, meaning that the evidence was insufficient to go to the jury in the first place. I dissent from that holding.

As the majority notes, plaintiffs' experts testified that the rezoning of plaintiffs' property from O-I to R-10 deprived plaintiffs of all practical, beneficial and reasonable use of the property. As the majority further notes, while the plaintiffs bear the burden of showing that the rezoning ordinance deprives plaintiffs of all practical use of the property and renders it of no reasonable value, for purposes of the City of Durham's motions for directed verdict and judgment notwithstanding the verdict, plaintiffs' evidence must be accepted as true.

> The judge must consider the evidence in the light most favorable to the nonmovant and may grant the motion only if, as a matter of law, the evidence is insufficient to justify a verdict for the nonmovant. *Dickinson v. Pake*, 284 N.C. 576, 201 S.E.2d 897 (1974). All conflicts in the evidence are to be resolved in the nonmovant's favor, and he must be given the benefit of every inference reasonably to be drawn in his favor. *Daughtry v. Turnage*, 295 N.C. 543, 246 S.E.2d 788 (1978). Conflicts, contradictions, and inconsistencies are to be resolved in the nonmovant's favor. *Summey v. Cauthen*, 283 N.C. 640, 197 S.E.2d 549 (1973).

*William v. Jones*, 322 N.C. 42, 48, 366 S.E.2d 433, 437, *reh'g denied*, 322 N.C. 486, 370 S.E.2d 237 (1988). In the instant case, the non-movants are the plaintiffs. Resolving all of the conflicts, contradictions and inconsistencies in the evidence in plaintiffs' favor and giving them the benefit of every inference reasonably to be drawn therefrom, I conclude that the evidence was sufficient to go to the jury and to sustain a finding that there was in fact a taking. Thus, I dissent from the Court's holding to the contrary.